**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**WildEarth Guardians,**                                        Civil Action No.

                    Plaintiff,

v.

**Extraction Oil & Gas, Inc.;**
**Bonanza Creek Energy Operating Company, LLC;**
**Crestone Peak Resources Operating, LLC;**
**Great Western Operating Company, LLC;**
**Mallard Exploration, LLC;**
**Noble Energy, Inc.; and**
**PDC Energy, Inc.**

                    Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PENALTIES**

---

### I. STATEMENT OF THE CASE

1.      This is a citizen enforcement suit brought under Section 304 of the Federal Clean
Air Act ("Clean Air Act)", 42 U.S.C. § 7604. Defendants, seven oil and gas companies, illegally
constructed and began operating massive sources of air pollution along Colorado's Front Range
region without obtaining legally required permits to pollute.   By evading their permitting
obligations, these companies have collectively realized an economic benefit of over $400
million. Defendants are operating their facilities unlawfully and their operations should be
enjoined until they obtain their required permits.

2.      At issue are actions by the seven Defendants, Extraction Oil and Gas, Inc.
("Extraction"), Bonanza Creek Energy Operating Company, LLC ("Bonanza"), Crestone Peak
Resources Operating, LLC ("Crestone"), Great Western Operating Company, LLC ("Great

Western"), Mallard Exploration, LLC ("Mallard"), Noble Energy, Inc. ("Noble"); and PDC Energy, Inc. ("PDC"). These companies have each constructed large oil and gas production facilities in the Denver Metro-North Front Range ozone nonattainment area, a region that is suffering from excessive smog pollution, without applying for and obtaining permits to assure emission reductions.

3.      Defendants have violated and are currently in violation of the Clean Air Act by variously (i) constructing oil and gas production facilities that are major sources of air pollution in the Denver Metro-North Front Range ozone nonattainment area without first obtaining the proper nonattainment new source review permits to pollute, (ii) operating oil and gas production facilities that are major sources of air pollution without complying with nonattainment new source review permits, and (iii) failing to comply with applicable hazardous air pollutant control requirements.

## II. JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction under Section 304 of the Clean Air Act, 42 U.S.C. § 7604. Jurisdiction also exists under 28 U.S.C. § 1331 (federal question) since this action is brought to address violations of Colorado's state implementation plan ("SIP") approved by the U.S. Environmental Protection Agency ("EPA") pursuant to 42 U.S.C. § 7410. Violations of a federally-delegated or federally-approved state pollution program arise under federal law. *See General Motors Corp. v. United States*, 496 U.S. 530, 533–534 (1990); *Sierra Club v. Public Serv. Co. of Colorado*, 894 F. Supp. 1455, 1456 (D.Colo. 1995); 59 Fed. Reg. 37,698 (July 25, 1994); 62 Fed. Reg. 18,716 (Apr. 17, 1997). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 7413 and 7604.

5.      On February 20, 2019, Plaintiff WildEarth Guardians ("Guardians") gave notice of these violations and its intent to file suit to the Defendants, Defendants' Registered Agents, Administrator of the EPA, Regional Administrator of EPA Region VIII, State of Colorado, and Colorado Department of Public Health and Environment ("CDPHE"), as required by Section 304(b) of the Clean Air Act, 42 U.S.C. § 7604(b), and 40 C.F.R. § 54.2.

6.      More than sixty days have elapsed since these notices were served.

7.      Neither EPA nor the State of Colorado have commenced, nor are they diligently prosecuting, any civil action in a United States or state court to redress the violations.

8.      The violations complained are taking place in Colorado. Venue is thus appropriate in the U.S. District Court for the District of Colorado, pursuant to Section 304(c) of the Clean Air Act, 42 U.S.C. § 7604(c), and 28 U.S.C. § 1391(b) and (c).

9.      A copy of this Complaint is being served simultaneously upon the Attorney General of the United States and the EPA Administrator pursuant to Section 304(c)(3) of the Clean Air Act, 42 U.S.C. § 7604(c)(3).

### III. PARTIES

10.     The Plaintiff in this action is WildEarth Guardians ("Guardians").

11.     Plaintiff Guardians sues on behalf of itself and its members.

12.     Guardians is a non-profit environmental advocacy and conservation organization based in Santa Fe, New Mexico. Guardians has offices throughout the West, including an office in Denver, Colorado. Guardians has more than 231,000 members and supporters. Many of these members reside in, recreate, and otherwise physically enjoy Colorado's Front Range, including

the non-attainment area discussed *infra*. Guardians and its members are dedicated to protecting and restoring the air resources in Colorado.

13.     Defendants' past and ongoing violations have led to unsightly air emissions or "haze" from their Facilities, noxious smells, increased risk of health impacts and consequential anxiety and concern, and contribute to a distasteful and unhealthy environment.

14.     Defendants' unpermitted and unlawful emissions have injured the interests of Guardians' members in breathing clean air, living, and working in an environment unimpaired by unhealthy, noxious, and distasteful pollutants and odors, and viewing natural scenery unimpaired by haze and other constituents of air pollution. Many Guardians' members live, work, and/or recreate in areas directly affected by the pollution from the Defendants' Facilities. Without these unpermitted and unlawful emissions, WildEarth Guardians' members' quality of life would improve, they would enjoy being outdoors and being in and around their homes more, and they would face a lower risk of cancers and other health problems.

15.     As a result of Defendants' violations of the Clean Air Act, Guardians' members breathe increased levels of ozone and related compounds, and are thus subject to increased risks of asthma, chronic bronchitis, respiratory infections, chronic obstructive pulmonary disease, and other serious adverse health impacts. The interests of Guardians' members have been, and unless the relief requested herein is granted, will continue to be, adversely affected by Defendants' violations of the Clean Air Act.

16.     Defendant Extraction is a corporation incorporated under the laws of Delaware with its corporate headquarters in Denver.

17.    Extraction is the owner and operator of the Enright, Johnson's Corner, and Trott oil and gas production facilities (the "Extraction Facilities"), which are located in Weld County and within the Denver Metro-North Front Range ozone nonattainment area. The Extraction Facilities consist of oil and gas wells and related production equipment, including separators, oil tanks (also called condensate tanks), produced water tanks, natural gas compressor engines, and oil loadout equipment.

18.    Defendant Bonanza is a corporation incorporated under the laws of Delaware with its corporate headquarters in Denver.

19.    Bonanza is the owner and operator of the Mustang 42-34, Mustang 14-26, Mustang Y-34, and Longhorn U-10 oil and gas production facilities (the "Bonanza Facilities"), which are located in Weld County and within the Denver Metro-North Front Range ozone nonattainment area. The Bonanza facilities consist of oil and gas wells and related production equipment, including separators, oil tanks, produced water tanks, and oil loadout equipment.

20.    Defendant Crestone is a corporation incorporated under the laws of Delaware with its corporate headquarters in Denver.

21.    Crestone is the owner and operator of the Kiyota 35H-O367 oil and gas production facility ("Crestone Facility"), which is located in Weld County and within the Denver Metro-North Front Range ozone nonattainment area. The Crestone facility consists of oil and gas wells and related production equipment, including separators, oil tanks, produced water tanks, natural gas compressor engines, and oil loadout equipment.

22.    Defendant Great Western is a corporation incorporated under the laws of Colorado with its corporate headquarters in Denver.

23.     Great Western is the owner and operator of the Wilson IC oil and gas production facility ("Great Western Facility"), which is located in Weld County and within the Denver Metro-North Front Range ozone nonattainment area. The Great Western facility consists of oil and gas wells and related production equipment, including separators, oil tanks, produced water tanks, compressor engines, and oil loadout equipment.

24.     Defendant Mallard is a corporation incorporated under the laws of Delaware with its corporate headquarters in Denver.

25.     Mallard is the owner and operator of the Anderson oil and gas production facility ("Mallard Facility"), which is located in Weld County and within the Denver Metro-North Front Range ozone nonattainment area. The Mallard Facility consists of oil and gas wells and related production equipment, including separators, oil tanks, produced water tanks, compressor engines, and oil loadout equipment.

26.     Defendant Noble is a corporation incorporated under the laws of Delaware with its corporate headquarters in Houston, Texas.

27.     Noble is the owner and operator of the G-35 Centennial State ECONODE, Hullabaloo Y-16-28A ECONODE, and Y-11 Waste Management ECONODE oil and gas production facilities ("Noble Facilities"), which are located in Weld County and within the Denver Metro-North Front Range ozone nonattainment area. The Noble facilities consist of oil and gas wells and related production equipment, including separators, oil tanks, produced water tanks, compressor engines, and oil loadout equipment.

28.     Defendant PDC is a corporation incorporated under the laws of Delaware with its corporate headquarters in Denver.

29.     PDC is the owner and operator of the Ward 20 Sec HZ and Sandin 24 Sec HZ oil and gas production facilities ("PDC Facilities), which are located in Weld County and within the Denver Metro-North Front Range ozone nonattainment area. The PDC facilities consist of oil and gas wells and related production equipment, including separators, oil tanks, produced water tanks, compressor engines, and oil loadout equipment.

30.     Each of Defendants' facilities described above (collectively "Defendants' Facilities")[1] release a number of air pollutants, but notably release large amounts of volatile organic compounds ("VOCs") related to the production of oil and gas. VOCs contribute to ozone pollution in the Denver Metro-North Front Range ozone nonattainment area. The VOCs, which include benzene and other toxic pollutants, are released during venting, flaring, and otherwise through the production and transportation of oil and natural gas.

## IV. LEGAL BACKGROUND

31.     The primary objective of the Colorado Air Pollution Prevention and Control Act, Colo. Rev. Stat. § 25-7-101, *et seq.*, is to "foster the health, welfare, convenience, and comfort of the inhabitants of the state of Colorado and to facilitate the enjoyment and use of the scenic and natural resources of the state[.]" Colo. Rev. Stat. § 25-7-102.

32.     Similarly, the objective of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]" Section 101(b), 42 U.S.C. § 7401(b).

---

[1] For ease of reading, Plaintiffs will refer to each of Defendant's facilities either by name ("[Defendant's] Facility") or more generally as "its Facility," or "the Facility," as made clear by the context.

33.    The Clean Air Act sets out a comprehensive regulatory scheme designed to prevent and control air pollution. The Clean Air Act directs the EPA to prescribe national ambient air quality standards at a level sufficient to protect the public health and welfare. 42 U.S.C. § 7409(a) and (b). In order to implement, maintain, and enforce these standards, each state is required to adopt an implementation plan of its own for that state, called a "state implementation plan" ("SIP"). 42 U.S.C. § 7410(a). If a SIP is approved by the EPA, its requirements become federal law and are fully enforceable in federal court. *General Motors v. United States*, 496 U.S. 530. 533-34 (1990).

A.    *<u>SIP Requirements for Ozone Nonattainment Areas</u>*

34.    Ozone is a key ingredient of smog and a toxic gas that can trigger asthma attacks, cause respiratory irritation, aggravate emphysema, and even cause premature death. *See* 80 Fed. Reg. 65,302-65,309 (Oct. 26, 2015) (summarizing adverse health effects of ozone). Due to its adverse health effects, the EPA has established national ambient air quality standards setting limits on ozone to protect public health and welfare. *See* 40 C.F.R. §§ 50.15 and 50.19. Ozone is formed when sunlight reacts with precursor gases. Key precursor gases include volatile organic compounds ("VOCs"), which are a byproduct of fossil fuel production and consumption, and nitrogen oxides ("NO$_x$"), which are a byproduct of combustion.

35.    The Denver Metro-North Front Range has been an ozone nonattainment area for over a decade.  *See* 73 Fed. Reg. 17,897, 17,898 (Apr. 2, 2008).  EPA designated this region, which includes all of Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, and Jefferson Counties, as well as most of Larimer and Weld Counties, as in nonattainment due to violations of ozone ambient air quality standards. *See* 40 C.F.R. § 81.306; *see also* Map Below. The non-

attainment area is currently designated a "moderate" nonattainment area based on violations of revised national ambient air quality standards ("NAAQS") for ozone adopted in 2008. *Id*. In 2018, numerous exceedances of ozone national ambient air quality standards were recorded. *See* Colorado Air Pollution Control Division ("APCD"), "Ozone Summary Table," available online at https://www.colorado.gov/airquality/html_resources/ozone_summary_table.pdf. The EPA is also expected to soon downgrade the nonattainment area to "serious" based on failure to meet the 2008 standards. This downgrade will lead to the imposition of more stringent air quality regulation in the region.



Fig. 1. Map of Denver Metro-North Front Range Ozone Nonattainment Area[2]

36.     Sources of air pollution associated with oil and gas production have been identified as major contributors to high ozone in the Denver Metro-North Front Range nonattainment area. One of the largest sources of emissions related to production from oil and gas wells are oil or condensate tanks and gas venting.

37.     In regions that violate federally established national ambient air quality standards for ground-level ozone, (*i.e.*, ozone nonattainment areas), the Colorado SIP requires that any proposed new or modified stationary source of air pollution that has the potential to emit 100 tons per year ("tpy") or more of an ozone-forming pollutant must obtain a nonattainment new source review permit prior to construction in order to prevent further "deterioration" of the air. AQCC Regulation No. 3, Part D (5 Colo. Code Regs. § 1001-05, Part D).[3]

38.     Among other things, a nonattainment new source review permit requires operators of new or modified major stationary sources to: (i) achieve "the lowest achievable emission rate," (ii) certify compliance at "all other existing major stationary sources owned, operated, or controlled by the applicant," (iii) achieve specific emission offset rates, (iv) include an analysis of alternative sites, sizes, produces processes, and environmental control techniques, and (v) demonstrate that emissions will not adversely impact visibility in Class I areas. *Id.* Section V.A.7.

---

[2] This map was prepared by WildEarth Guardians using data from the EPA.

[3] The EPA most recently took action to approve Colorado's nonattainment new source review regulations as part of the SIP in July 2018. 83 Fed. Reg. 31,068, 31,070 (July 3, 2018). The EPA previously approved of Colorado's nonattainment new source review SIP in January 2016. 81 Fed. Reg. 3,693, 3,697 (Jan. 25, 2016).

39.     In a "moderate" ozone nonattainment area in Colorado, such as the Denver
Metro-North Front Range, new major sources must meet a VOC offset ratio of 1.15 to 1. AQCC
Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05, Part
D V.A.3.a(i)(b)). This means that for every ton of added VOC emissions from a major stationary
source, operators are required reduce emissions from another source or sources by 1.15 tons.

40.     The potential to emit of a stationary source of air pollution is defined in the
Colorado SIP as "The maximum capacity of a stationary source to emit a pollutant under its
physical and operational design." AQCC Common Provisions Regulation, Section I.G (5 Colo.
Code Regs. § 1001-02, Part G I.G). Although emission controls can be considered to be part of a
source's "operational design[,]" they can only be considered part of a source's design "if the
limitation or the effect it would have on emissions is state enforceable and federally
enforceable." *Id*.

41.     In other words, unless measures undertaken to reduce emissions are federally and
as a practical matter enforceable, those emissions are not considered "controlled" for purposes of
the Clean Air Act and the Colorado SIP.

42.     Furthermore, in a nonattainment area, no major stationary source of air pollution
"shall . . . begin actual construction . . . unless a permit has been issued containing all applicable
state and federal requirements." AQCC Regulation No. 3, Part D, Section I.A.1 (5 Colo. Code
Regs. § 1001-05, Part D I.A.1); *see also* 42 U.S.C. § 7503 and 40 C.F.R. § 51.165 (setting forth
nonattainment new source review requirements that must be implemented in a SIP). Under the
Colorado SIP, the term "begin actual construction" is defined as the "[i]nitiation of physical on-
site construction activities on an emissions unit that are of a permanent nature [including, but not

limited to] installation of building supports and foundations, laying of underground pipe work, and construction of permanent storage structures." AQCC Regulation No. 3, Part D, Section II.A.7 (5 Colo. Code Regs. § 1001-05, Part D II.A.7).

43.     Defendants have, in some cases, applied to CDPHE for a "synthetic minor" permit for a synthetic minor source.[4]  A synthetic minor permit does not substitute for a permit for a major stationary source of air pollution, and, according to the EPA, even the possession of a synthetic minor permit does not allow a permittee to evade statutory penalties for the lack of otherwise required permits.   Moreover, not a single Defendant possesses a synthetic minor permit.

## B.  *Requirements for Emissions of Hazardous Air Pollutants*

44.     Under the Clean Air Act, any new or modified source of air pollution that releases more than 25 tons per year of listed hazardous air pollutants ("HAPs") or 10 tons per year of any individual HAP is considered a major source and must meet maximum achievable control technology ("MACT") requirements. *See* 42 U.S.C. § 7412(g)(2)(B), 40 C.F.R. § 63.5(b)(3)(i).

45.     Hazardous air pollutants include particularly toxic substances, such as benzene, a known carcinogen. The list of regulated hazardous air pollutants is set forth under the Clean Air Act. *See* 42 U.S.C. § 7412(b)(1).

46.     Oil and gas production facilities that are major sources of HAPs must comply with MACT requirements set forth at 40 C.F.R. §§ 63.760–63.777 (referred to as "Subpart HH").

---

[4] "Synthetic minor source" is a term of art and means a source that otherwise has the potential to emit air pollutants in amounts that are at or above the thresholds for major sources, as applicable, but has accepted restrictions on its operations so that its emissions potential is less than such amounts for major sources. Such restrictions must be federally enforceable and enforceable as a practical matter.

47.     Under Subpart HH, a determination of major source status at an oil and gas production facility is based on potential emissions from storage vessels and glycol dehydrators. *See* 40 C.F.R. §§ 63.761 63.2.

48.     The potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design.  40 C.F.R. § 63.2.

### C. *Citizen Suit Provisions Under the Clean Air Act*

49.     Under the Clean Air Act, citizens are entitled to bring suit against any entity that "constructs any new or modified major emitting facility without a permit required under [] part D of subchapter I (relating to nonattainment)[.]" 42 U.S.C. § 7604(a)(3). Further, citizens are entitled to bring suit against any person who has violated "an emission standard or limitation[.]" *Id.* § 7604(a)(1). An "emission standard or limitation" includes any "emission limitation, standard of performance, or emissions standard," and "any requirement to obtain a permit as a condition of operations." *Id.* § 7604(f)(1) and (4). Citizens can seek to enjoin violations of the Clean Air Act, seek civil penalties for such violations, and secure other appropriate relief. *Id.* § 7604(a)(3).

50.     Under the Clean Air Act, penalties of up to $99,681 per day per violation are provided to deter future violations. *See* 84 Fed. Reg. 2056, 2059 (Feb. 6, 2019).

51.     No citizen suit may be brought under 42 U.S.C. § 7604(a)(1) "prior to 60 days" after giving notice of the violations to the violator, the EPA Administrator, and the state where the violations occurred. 42 U.S.C. § 7604(b)(1)(A). Copies of notices of citizen suits must also be served upon the EPA Regional Administrator for the Region in which the violations occurred and also upon the "Governor of the State." 40 C.F.R. §§ 54.2(a) and (b). Where a violator is a

corporation, notice must also be served by certified mail upon the Registered Agent of that corporation in the state where the violations occurred. *Id.* § 54.2(c). If served by U.S. mail, service of notices of citizen suits under the Clean Air Act is accomplished upon "postmark date." *Id.* § 54.2(d).

52.     No citizen suit may be brought under 42 U.S.C. § 7604(a)(1) if the EPA or state "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance[.]" 42 U.S.C. § 7604(b)(1)(B).

## V. FACTUAL BACKGROUND

53.     According to data from the APCD and the Colorado Oil and Gas Conservation Commission, Defendants constructed and began operation of their respective Facilities in Weld County within the Denver Metro-North Front Range ozone nonattainment area.

54.     According to Defendants' own submissions to the APCD, their respective Facilities were constructed without obtaining legally required preconstruction permits and, in many cases, were constructed without complying with applicable MACT requirements under the Clean Air Act.

55.     Defendants continue to operate out of compliance with the Colorado SIP and the Clean Air Act, as explained further below.

**A.** ***Extraction's Facilities are Major Sources of Emissions Constructed and Operating in the Denver Metro-North Front Range Nonattainment Area Unlawfully in Violation of the Colorado SIP and Clean Air Act.***

56.     The Extraction Facilities were constructed in Weld County, Colorado, within the Denver Metro-North Front Range 8-hour ozone nonattainment area.

57.     They are generally located near the town of Berthoud, Colorado.

14



Fig. 2. Map of Extraction facility locations based on coordinates provided in company's Annual Pollutant Emission Notices.

58.     Extraction began construction of the Enright Facility on or around May 2018.

59.     The Enright Facility began operation (i.e., first started producing oil and gas) on or about October 25, 2018.

60.     Extraction applied for a "synthetic minor" air pollution permit from the APCD for its Enright Facility on or around January 23, 2019.

61.     Extraction began construction of the Johnson's Corner Facility on or around April 2017.

62.     The Johnson's Corner Facility began operation on or about February 26, 2018.

63.     Extraction applied for a synthetic minor permit for the Johnson's Corner Facility on or around May 23, 2018.

64.     Extraction began construction of the Trott Facility on or around November 2017.

65.     The Trott Facility began operation on or about October 5, 2018.

66.     Extraction applied for a synthetic minor permit for the Trott Facility on or around December 21, 2018.

67.     Extraction has not received all necessary permits from the APCD under the Colorado SIP and the Clean Air Act for its Facilities.

68.     Actual construction began at the Extraction Facilities prior to their first date of production.

69.     Extraction did not submit applications for nonattainment new source review permits for its Facilities prior to construction.

70.     The Enright, Johnson's Corner, and Trott Facilities each have the potential to emit more than 100 tons per year of VOCs.

71.     The Enright, Johnson's Corner, and Trott Facilities, particularly oil and/or condensate tanks and gas venting at its Facilities, have the potential to emit thousands of tons per year of VOCs.

72.     Extraction was required to obtain preconstruction nonattainment new source review permits prior to beginning actual construction of the Extraction Facilities.

73.     According to Extraction's own admissions in its permit applications and certified emission notices submitted to the APCD, the Extraction Facilities have the potential to emit as follows:

| Facility | Potential to Emit for VOCs (tons/year) |
|---|---|
| Enright | 1,355.6 |

| | |
|---|---|
| Johnson's Corner | 3,461.5 |
| Trott | 1,256.3 |

74.     The Extraction Facilities have continued to operate and release air pollution since they were first constructed.

75.     The Extraction Facilities are currently operating without any federally enforceable limits on air pollution, meaning there is no exemption that otherwise disqualifies them as major sources under nonattainment new source review.

76.     The Extraction Facilities are currently actual major sources of VOC emissions.

77.     Extraction constructed and is now operating the Extraction Facilities as major sources of VOC emissions.

78.     In its synthetic minor source permit applications, Extraction seeks to establish federally enforceable limits to reduce potential emissions below major source thresholds at the Extraction Facilities.

79.     Federally enforceable limits cannot apply to Extraction's operations to reduce its potential emissions below major source thresholds.

80.     To this day, Extraction does not have legally required permits to pollute at the Extraction Facilities and is not complying with nonattainment new source review requirements under the Colorado SIP and the Clean Air Act.

81.     Constructing the Enright, Johnson's Corner, and Trott oil and gas production facilities without legally required preconstruction or nonattainment new source review air pollution permits violates the Colorado SIP and the Clean Air Act.

82.     The Extraction Facilities continue to produce oil and gas. Data from the Colorado Oil and Gas Conservation Commission indicates its facilities have produced and sold hundreds of thousands of barrels of oil and thousands of cubic feet of natural gas since being constructed.

83.     Extraction continues to operate the Enright, Johnson's Corner, and Trott Facilities without having legally required preconstruction permits, reaping enormous economic benefits.

84.     If Extraction had complied with nonattainment new source review requirements, the company would already be meeting more stringent pollution controls and would have prevented many months of unpermitted emissions.

85.     If Extraction had complied with nonattainment new source review requirements, it would be achieving a net decrease in emissions due to nonattainment new source review offset requirements.

86.     Extraction has not offset emissions from its Facilities consistent with the Colorado SIP.

87.     For every ton of added VOC emissions from its Facilities, Extraction was required to reduce emissions from another source or sources by 1.15 tons. AQCC Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05 Part D V.A.3.a(i)(b)).

88.     Neither the EPA nor the State of Colorado has commenced an enforcement action in federal or state court over Extraction's violations of the SIP and the Clean Air Act at its Facilities.

89.     On February 20, 2019, Guardians notified Extraction via certified mail of its intent to pursue a citizen enforcement action in federal court over the violations at the Extraction Facilities. According to certified mail green return receipts, Extraction received the notice on February 21, 2019. The notice was also served by certified mail upon Extraction's Registered Agent, as well as to the EPA Administrator, the EPA Regional Administrator, the Governor of Colorado, and the Director of CDPHE.

90.     In the notice, Guardians requested Extraction cease operations at its Facilities and come into compliance with the Clean Air Act.

91.     Extraction has not responded to Guardians' notice letter.

**B.** ***Bonanza's Facilities are Major Sources of Emissions Constructed and Operating in the Denver Metro-North Front Range Nonattainment Area Unlawfully in Violation of the Colorado SIP and Clean Air Act.***

92.     The Bonanza Facilities were constructed in Weld County, Colorado, within the Denver Metro-North Front Range 8-hour ozone nonattainment area.

93.      They are generally located southeast of Greeley, Colorado.



Fig. 3. Map of Bonanza's facility locations based on coordinates provided in company's Annual Pollutant Emission Notices.

94.     Bonanza began construction at the Mustang 14-26 Facility on or around September 2017.

95.     The Mustang 14-26 Facility began operation (i.e., first started producing oil and gas) on or about May 1, 2018.

96.     Bonanza applied for a synthetic minor source air pollution permit from the APCD for its Mustang 14-26 Facility on or about July 20, 2018.

97.     Bonanza began construction at the Mustang 42-34 Facility on or around October 2017.

98.     The Mustang 42-34 Facility began operation on or about May 19, 2018.

99.    Bonanza applied for a synthetic minor permit for the Mustang 42-34 Facility on or about August 16, 2018.

100.    Bonanza began construction at the Mustang Y-34 Facility on or around October 2017.

101.    The Mustang Y-34 Facility began operation on or about June 20, 2018.

102.    Bonanza applied for a synthetic minor permit for the Mustang Y-34 facility on pr about September 18, 2018.

103.    Bonanza began construction at the Longhorn U-10 Facility on or around October 2017.

104.    The Longhorn U-10 Facility began operation on or about July 13, 2018.

105.    Bonanza applied for a synthetic minor permit for the Longhorn U-10 Facility on or about October 9, 2018.

106.    Bonanza has not received all necessary permits from the APCD under the Colorado SIP and the Clean Air Act for its Facilities.

107.    Actual construction began at the Bonanza Facilities prior to their first date of production.

108.    Bonanza did not submit applications for nonattainment new source review permits for its Facilities prior to construction.

109.    The Bonanza Facilities each have the potential to emit more than 100 tons per year of VOCs.

110.    The Bonanza Facilities also all have the potential to emit greater than 25 tons of hazardous air pollutants from storage vessels. The Bonanza Facilities also have the potential to

emit more than 10 tons per year of n-hexane, a hazardous air pollutant listed under the Clean Air Act, from storage vessels.

111.    The Mustang 14-26, Mustang 42-34, Mustang Y-34, and Longhorn U-10 facilities, particularly oil and/or condensate tanks and gas venting at Bonanza's Facilities, have the potential to emit thousands of tons per year of VOCs.

112.    Bonanza was required to obtain preconstruction nonattainment new source review permits, as well as comply with MACT requirements, prior to beginning actual construction of its Facilities.

113.    According to Bonanza's own admissions in its permit applications and certified emission notices submitted to the APCD, its Facilities have the potential to emit as follows:

| Facility | Potential to Emit for VOCs (tons/year) | Total Potential to Emit for Hazardous Air Pollutants From Storage Vessels (tons/year) | Total Potential to Emit for n-Hexane From Storage Vessels (tons/year) |
|---|---|---|---|
| Mustang 14-26 | 2,625.9 | 81.25 | 71.63 |
| Mustang 42-34 | 2,625.2 | 81.35 | 71.72 |
| Mustang Y-34 | 2,625.2 | 81.35 | 71.72 |
| Longhorn U-10 | 3,827.1 | 80.17 | 70.62 |

114.    The Bonanza Facilities have continued to operate and release air pollution since they were first constructed.

115.    The Bonanza Facilities are currently operating without any federally enforceable limits on air pollution, meaning there is no exemption that otherwise disqualifies them as major sources under nonattainment new source review and hazardous air pollutant requirements.

116.    The Bonanza Facilities are currently actual major sources of VOC emissions and hazardous air pollutants.

117.    Bonanza constructed and is now operating its Facilities as major sources of VOCs and hazardous air pollutants.

118.    In its synthetic minor source permit applications, Bonanza seeks to establish federally enforceable limits to reduce potential emissions below major source thresholds at its Facilities.

119.    Federally enforceable limits cannot now apply to Bonanza's operations to reduce its potential emissions below major source thresholds.

120.    To this day, Bonanza does not have legally required permits to pollute at its Facilities and is not complying with nonattainment new source review requirements under the Colorado SIP, as well as hazardous air pollution limits set forth under Section 112 of the Clean Air Act.

121.    Constructing the Mustang 14-26, Mustang 42-34, Mustang Y-34, and Longhorn U-10 Facilities without legally required nonattainment new source review air pollution permits violates the Colorado SIP.

122.    Construction of the Bonanza Facilities without complying with MACT limits on toxic air pollution also violates the Clean Air Act.

123.    The Bonanza Facilities are not subject to any exemption under Section 112 of the Clean Air Act or Subpart HH.

124.    The Bonanza Facilities continue to produce oil and gas. Data from the Colorado Oil and Gas Conservation Commission indicates the Bonanza Facilities have produced and sold hundreds of thousands of barrels of oil and thousands of cubic feet of natural gas since being constructed.

125.    Bonanza continues to operate the Mustang 14-26, Mustang 42-34, Mustang Y-34, and Longhorn U-10 Facilities without having legally required preconstruction permits, reaping enormous economic benefits.

126.    If Bonanza had complied with nonattainment new source review requirements and applicable MACT requirements, the company would already be meeting more stringent pollution controls and would have prevented many months of unpermitted emissions.

127.    If Bonanza had complied with nonattainment new source review requirements, it would be achieving a net decrease in emissions due to nonattainment new source review offset requirements.

128.    Bonanza has not offset emissions from its Facilities consistent with the Colorado SIP.

129.    For every ton of added VOC emissions from its Facilities, Bonanza was required to reduce emissions from another source or sources by 1.15 tons. AQCC Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05 Part D V.A.3.a(i)(b)).

130.     Neither the EPA nor the State of Colorado has commenced an enforcement action in federal or state court over Bonanza's violations of the SIP and the Clean Air Act at its Facilities.

131.     On February 20, 2019, Guardians notified Bonanza via certified mail of its intent to pursue a citizen enforcement action in federal court over the violations at its Facilities. According to certified mail green return receipts, Bonanza received the notice on February 21, 2019. The notice was also served by certified mail upon Bonanza's Registered Agent, as well as to the EPA Administrator, the EPA Regional Administrator, the Governor of Colorado, and the Director of CDPHE.

132.     In the notice, Guardians requested Bonanza cease operations at its Facilities and come into compliance with the Clean Air Act.

133.     Bonanza has not responded to Guardians' notice letter.

### C.   *Crestone's Facility is a Major Source of Emissions Constructed and Operating in the Denver Metro-North Front Range Nonattainment Area Unlawfully in Violation of the Colorado SIP and Clean Air Act.*

134.     The Crestone Facility was constructed in Weld County, Colorado, within the Denver Metro-North Front Range 8-hour ozone nonattainment area.

135.    The Crestone Facility is generally located near Platteville, Colorado.



Fig. 4. Map of the location of Crestone's facility based on coordinates provided in company's Annual Pollutant Emission Notices.

136.    Crestone began construction at the Kiyota 35H-O367 Facility on or around August 2017.

137.    The Kiyota Facility began operation (i.e., first started producing oil and gas) on or about February 21, 2018.

138.    Crestone applied for a synthetic minor source air pollution permit from the APCD for its Kiyota Facility on or about May 21, 2018.

139.     Crestone has not received all necessary permits from the APCD under the Colorado SIP and the Clean Air Act for its Facility.

140.     Actual construction began at the Crestone Facility prior to its first date of production.

141.     Crestone did not submit an application for nonattainment new source review permits for the Facility prior to construction.

142.     The Crestone Facility has the potential to emit more than 100 tons per year of VOCs.

143.     The Crestone Facility also has the potential to emit greater than 25 tons of hazardous air pollutants from storage vessels. The Facility also has the potential to emit more than 10 tons per year of n-hexane, a hazardous air pollutant listed under the Clean Air Act, from storage vessels.

144.     The Crestone Facility, particularly oil and/or condensate tanks and gas venting at the Facility, has the potential to emit more than a thousand tons per year of VOCs.

145.     Crestone was required to obtain preconstruction nonattainment new source review permits, as well as comply with MACT requirements, prior to beginning actual construction of its Facility

146.     According to Crestone's own admissions in its permit application and certified emission notices submitted to the APCD, the Crestone Facility has the potential to emit as follows:

| Facility | Potential to Emit for VOCs (tons/year) | Total Potential to Emit for Hazardous Air Pollutants From Storage Vessels (tons/year) | Total Potential to Emit for n-Hexane From Storage Vessels (tons/year) |
|---|---|---|---|
| Kiyota 35H-O367 | 1,540.9 | 27.27 | 18.57 |

147.    The Crestone Facility has continued to operate and release air pollution since it was first constructed.

148.    The Crestone Facility is currently operating without any federally enforceable limits on air pollution, meaning there is no exemption that otherwise disqualifies it as a major source under nonattainment new source review and hazardous air pollutant requirements.

149.    The Crestone Facility is currently an actual major source of VOC emissions and hazardous air pollutants.

150.    Crestone constructed and is now operating its Facility as major sources of VOCs and hazardous air pollutants.

151.    In its synthetic minor source permit application, Crestone seeks to establish federally enforceable limits to reduce potential emissions below major source thresholds at its Facility.

152.    Federally enforceable limits cannot now apply to Crestone's operations to reduce its potential emissions below major source thresholds.

153.    To this day, Crestone does not have legally required permits to pollute at the Facility and is not complying with nonattainment new source review requirements under the Colorado SIP, as well as hazardous air pollution limits set forth under Section 112 of the Clean Air Act.

154.    Constructing the Kiyota Facility without legally required nonattainment new source review air pollution permits violates the Colorado SIP.

155.    Construction the Facility without complying with MACT limits on toxic air pollution also violates the Clean Air Act.

156.    The Crestone Facility is not subject to any exemption under Section 112 of the Clean Air Act or Subpart HH.

157.    The Crestone Facility continues to produce oil and gas. Data from the Colorado Oil and Gas Conservation Commission indicates the facility has produced and sold hundreds of thousands of barrels of oil and thousands of cubic feet of natural gas since being constructed.

158.    Crestone continues to operate the Kiyota Facility without having legally required preconstruction permits, reaping enormous economic benefits.

159.    If Crestone had complied with nonattainment new source review requirements and applicable MACT requirements, the company would already be meeting more stringent pollution controls and would have prevented many months of unpermitted emissions.

160.    If Crestone had complied with nonattainment new source review requirements, it would be achieving a net decrease in emissions due to nonattainment new source review offset requirements.

161.    Crestone has not offset emissions from its Facility consistent with the Colorado SIP.

162.    For every ton of added VOC emissions from the Facility, Crestone was required to reduce emissions from another source or sources by 1.15 tons. AQCC Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05 Part D V.A.3.a(i)(b)).

163.    Neither the EPA nor the State of Colorado has commenced an enforcement action in federal or state court over Crestone's violations of the SIP and the Clean Air Act at its Facility.

164.    On February 20, 2019, Guardians notified Crestone via certified mail of its intent to pursue a citizen enforcement action in federal court over the violations at the Facility. According to certified mail green return receipts, Crestone received the notice on February 22, 2019. The notice was also served by certified mail upon Crestone's Registered Agent, as well as to the EPA Administrator, the EPA Regional Administrator, the Governor of Colorado, and the Director of CDPHE.

165.    In the notice, Guardians requested Crestone cease operations at the Facility and come into compliance with the Clean Air Act.

166.    Crestone has not responded to Guardians' notice letter.

### D.  *Great Western's Facility is a Major Source of Emissions Constructed and Operating in the Denver Metro-North Front Range Nonattainment Area Unlawfully in Violation of the Colorado SIP and Clean Air Act.*

167.    The Great Western Facility was constructed in Weld County, Colorado, within the Denver Metro-North Front Range 8-hour ozone nonattainment area.

168.    The Great Western Facility is generally located northeast of the town of Mead, Colorado.



Fig. 5. Map of the location of Great Western's facility based on coordinates provided in company's Annual Pollutant Emission Notices.

169.    Great Western began construction at the Wilson IC Facility on or around April 2018.

170.    The Wilson Facility began operation (i.e., first started producing oil and gas) on or about February 21, 2018.

171.    Great Western applied for a synthetic minor source air pollution permit from the APCD for its Wilson Facility on or about December 20, 2018.

172.    Great Western has not received all necessary permits from the APCD under the Colorado SIP and the Clean Air Act for its Facility.

173.    Actual construction began at the Great Western Facility prior to its first date of production.

174.    Great Western did not submit an application for nonattainment new source review permits for the Facility prior to construction.

175.    The Great Western Facility has the potential to emit more than 100 tons per year of VOCs.

176.    The Great Western Facility, particularly oil and/or condensate tanks and gas venting at the Facility, has the potential to emit more than 300 tons per year of VOCs.

177.    Great Western was required to obtain preconstruction nonattainment new source review permits prior to beginning actual construction of its Facility

178.    According to Great Western's own admissions in its permit application and certified emission notices submitted to the APCD, the Great Western Facility has the potential to emit as follows:

| Facility | Potential to Emit for VOCs (tons/year) |
|---|---|
| Wilson IC | 312.4 |

179.    The Great Western Facility has continued to operate and release air pollution since it was first constructed.

180.    The Great Western Facility is currently operating without any federally enforceable limits on air pollution, meaning there is no exemption that otherwise disqualifies it as a major source under nonattainment new source review requirements.

181.    The Great Western Facility is currently an actual major source of VOC emissions.

182.    Great Western constructed and is now operating its Facility as major sources of VOCs.

183.    In its synthetic minor source permit application, Great Western seeks to establish federally enforceable limits to reduce potential emissions below major source thresholds at the Facility.

184.    Federally enforceable limits cannot now apply to Great Western's operations to reduce its potential emissions below major source thresholds.

185.    To this day, Great Western does not have legally required permits to pollute at the Facility and is not complying with nonattainment new source review requirements under the Colorado SIP and the Clean Air Act.

186.    Constructing the Wilson Facility without legally required nonattainment new source review air pollution permits violates the Colorado SIP.

187.    The Wilson Facility continues to produce oil and gas. Data from the Colorado Oil and Gas Conservation Commission indicates the facility has produced and sold tens of thousands of barrels of oil and thousands of cubic feet of natural gas since being constructed.

188.    Great Western continues to operate the Wilson Facility without having legally required preconstruction permits, reaping enormous economic benefits.

189.    If Great Western had complied with nonattainment new source review requirements, the company would already be meeting more stringent pollution controls and would have prevented many months of unpermitted emissions.

190.    If Great Western had complied with nonattainment new source review requirements, it would be achieving a net decrease in emissions due to nonattainment new source review offset requirements.

191.    Great Western has not offset emissions from its Facility consistent with the Colorado SIP.

192.    For every ton of added VOC emissions from the Facility, Great Western was required to reduce emissions from another source or sources by 1.15 tons. AQCC Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05 Part D V.A.3.a(i)(b)).

193.    Neither the EPA nor the State of Colorado has commenced an enforcement action in federal or state court over Great Western's violations of the SIP and the Clean Air Act at the Facility.

194.    On February 20, 2019, Guardians notified Great Western via certified mail of its intent to pursue a citizen enforcement action in federal court over the violations at the Facility. According to certified mail green return receipts, Great Western received the notice on February 22, 2019. The notice was also served by certified mail upon Great Western's Registered Agent, as well as to the EPA Administrator, the EPA Regional Administrator, the Governor of Colorado, and the Director of CDPHE.

195.    In the notice, Guardians requested that Great Western cease operations at its Facility and come into compliance with the Clean Air Act.

196.    Great Western has not responded to Guardians' notice letter.

### E. *Mallard's Facility is a Major Source of Emissions Constructed and Operating in the Denver Metro-North Front Range Nonattainment Area Unlawfully in Violation of the Colorado SIP and Clean Air Act.*

197.    The Mallard Facility was constructed in Weld County, Colorado, within the Denver Metro-North Front Range 8-hour ozone nonattainment area.

198.    The Mallard Facility is generally located northeast of Greeley and is within the Pawnee National Grassland.



Fig. 6. Map of the location of Mallard's facility based on coordinates provided in company's Annual Pollutant Emission Notices.

199.    Mallard began construction at the Anderson Facility on or around August 2017.

200.     The Anderson Facility began operation (i.e., first started producing oil and gas) on or about May 15, 2018.

201.     Mallard applied for a synthetic minor source air pollution permit from the APCD for its Anderson Facility on or about August 17, 2018.

202.     Mallard has not received all necessary permits from the APCD under the Colorado SIP and the Clean Air Act for its Anderson Facility.

203.     Actual construction began at the Facility prior to its first date of production.

204.     Mallard did not submit an application for nonattainment new source review permits for its Facility prior to construction.

205.     The Mallard Facility has the potential to emit more than 100 tons per year of VOCs.

206.     The Mallard Facility also has the potential to emit greater than 25 tons of hazardous air pollutants from storage vessels. The Mallard Facility also has the potential to emit more than 10 tons per year of n-hexane, a hazardous air pollutant listed under the Clean Air Act, from storage vessels.

207.     The Mallard Facility, particularly oil and/or condensate tanks and gas venting at the Facility, has the potential to emit nearly a thousand tons per year of VOCs.

208.     Mallard was required to obtain preconstruction nonattainment new source review permits, as well as comply with MACT requirements, prior to beginning actual construction of its Facility

209.    According to Mallard's own admissions in its permit application and certified emission notices submitted to the APCD, the Mallard Facility has the potential to emit as follows:

| Facility | Potential to Emit for VOCs (tons/year) | Total Potential to Emit for Hazardous Air Pollutants From Storage Vessels (tons/year) | Total Potential to Emit for n-Hexane From Storage Vessels (tons/year) |
|---|---|---|---|
| Kiyota 35H-O367 | 915.6 | 33 | 32.99 |

210.    The Mallard Facility has continued to operate and release air pollution since it was first constructed.

211.    The Mallard Facility is currently operating without any federally enforceable limits on air pollution, meaning there is no exemption that otherwise disqualifies it as a major source under nonattainment new source review and hazardous air pollutant requirements.

212.    The Mallard Facility is currently an actual major source of VOC emissions and hazardous air pollutants.

213.    Mallard constructed and is now operating the Facility as major sources of VOCs and hazardous air pollutants.

214.    In its synthetic minor source permit application, Mallard seeks to establish federally enforceable limits to reduce potential emissions below major source thresholds at its Facility.

215.    Federally enforceable limits cannot now apply to Mallard's operations to reduce its potential emissions to reduce its potential emissions below major source thresholds.

216.    To this day, Mallard does not have legally required permits to pollute at its Facility and is not complying with nonattainment new source review requirements under the Colorado SIP, as well as hazardous air pollution limits set forth under Section 112 of the Clean Air Act.

217.    Constructing the Facility without legally required nonattainment new source review air pollution permits violates the Colorado SIP.

218.    Constructing the Mallard Facility without complying with MACT limits on toxic air pollution also violates the Clean Air Act.

219.    The Mallard Facility is not subject to any exemption under Section 112 of the Clean Air Act or Subpart HH.

220.    The Mallard Facility continues to produce oil and gas. Data from the Colorado Oil and Gas Conservation Commission indicates the facility has produced and sold hundreds of thousands of barrels of oil and thousands of cubic feet of natural gas since being constructed.

221.    Mallard continues to operate the Anderson Facility without having legally required preconstruction permits, reaping enormous economic benefits.

222.    If Mallard had complied with nonattainment new source review requirements and applicable MACT requirements, the company would already be meeting more stringent pollution controls and would have prevented many months of unpermitted emissions.

223.    If Mallard had complied with nonattainment new source review requirements, it would be achieving a net decrease in emissions due to nonattainment new source review offset requirements.

224.    Mallard has not offset emissions from its Facility consistent with the Colorado SIP.

225.    For every ton of added VOC emissions from the Facility, Mallard was required to reduce emissions from another source or sources by 1.15 tons. AQCC Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05 Part D V.A.3.a(i)(b)).

226.    Neither the EPA nor the State of Colorado has commenced an enforcement action in federal or state court over Mallard's violations of the SIP and the Clean Air Act at the Facility.

227.    On February 20, 2019, Guardians notified Mallard via certified mail of its intent to pursue a citizen enforcement action in federal court over the violations at the Facility. According to certified mail green return receipts, Mallard received the notice on February 22, 2019. The notice was also served by certified mail upon Mallard's Registered Agent, as well as to the EPA Administrator, the EPA Regional Administrator, the Governor of Colorado, and the Director of CDPHE.

228.    In the notice, Guardians requested Mallard cease operations at the Facility and come into compliance with the Clean Air Act.

229.    Mallard has not responded to Guardians' notice letter.

F.    ***Noble's Facilities are Major Sources of Emissions Constructed and Operating in the Denver Metro-North Front Range Nonattainment Area Unlawfully in Violation of the Colorado SIP and Clean Air Act.***

230.    The Noble Facilities were constructed in Weld County, Colorado, within the Denver Metro-North Front Range 8-hour ozone nonattainment area.

231.    The Noble Facilities are generally located near the town of Keenesburg, Colorado.



Fig. 7. Map of the location of Noble's facilities based on coordinates provided in company's Annual

Pollutant Emission Notices.

232.     Noble began construction of the Centennial State Facility on or around October

2017.

233.     The Centennial State Facility began operation (i.e., first started producing oil and

gas) on or about July 15, 2018.

234.     Noble applied for a synthetic minor air pollution permit from the APCD for its

Centennial State Facility on or about October 12, 2018.

235.     Noble began construction of the Hullabaloo Facility on or around August 2017.

236.     The Hullabaloo Facility began operation on or about June 10, 2018.

237.     Noble applied for a synthetic minor permit for the Hullabaloo Facility on or about September 5, 2018.

238.     Noble began construction of the Waste Management Facility on or around August 2017.

239.     The Waste Management Facility began operation on or about October 5, 2018.

240.     Noble applied for a synthetic minor permit for the Waste Management facility on or about December 3, 2018.

241.     Noble has not received all necessary permits from the APCD under the Colorado SIP and the Clean Air Act for its Facilities.

242.     Actual construction began at the Noble Facilities prior to their first date of production.

243.     Noble did not submit applications for nonattainment new source review permits for its Facilities.

244.     The Centennial State, Hullabaloo, and Waste Management Facilities each have the potential to emit more than 100 tons per year of VOCs.

245.     The Centennial State Facility also has the potential to emit more than 25 tons of hazardous air pollutants from storage vessels. The Noble Facilities also have the potential to emit more than 10 tons per year of n-hexane, a hazardous air pollutant listed under the Clean Air Act, from storage vessels.

246.     The Centennial State, Hullabaloo, and Waste Management Facilities, particularly oil tanks and gas venting, have the potential to emit thousands of tons per year of VOCs.

247.    Noble was required to obtain preconstruction nonattainment new source review permits, as well as comply with MACT requirements as applicable, prior to beginning actual construction of its Facilities.

248.    According to Noble's own admissions in its permit applications and certified emission notices submitted to the APCD, the Noble Facilities have the potential to emit as follows:

| Facility | Potential to Emit for VOCs (tons/year) | Total Potential to Emit for Hazardous Air Pollutants From Storage Vessels (tons/year) | Total Potential to Emit for n-Hexane From Storage Vessels (tons/year) |
|---|---|---|---|
| Centennial State | 1,540.9 | 27.27 | 18.57 |
| Hullabaloo | 1,219.6 | 1.19 | 0.82 |
| Waste Management | 1,018 | 0.5 | 0.34 |

249.    The Noble Facilities have continued to operate and release air pollution since they were first constructed.

250.    The Noble Facilities are currently operating without any federally enforceable limits on air pollution, meaning there is no exemption that otherwise disqualifies them as major sources under nonattainment new source review. Further, there is no exemption that otherwise disqualifies the Centennial State Facility as a major source of hazardous air pollutants.

251.    The Noble Facilities are currently actual major sources of VOC emissions.

252.    The Centennial State Facility is also currently a major source of hazardous air pollutants.

42

253.   Noble constructed and is now operating its Facilities as major sources.

254.   In its synthetic minor source permit applications, Noble seeks to establish federally enforceable limits to reduce potential emissions below major source thresholds at its Facilities.

255.   Federally enforceable limits cannot now apply to Noble's operations to reduce its potential emissions below major source thresholds.

256.   To this day, Noble does not have legally required permits to pollute at its Facilities and is not complying with nonattainment new source review requirements under the Colorado SIP and the Clean Air Act.

257.   Noble is further not complying with MACT requirements under the Clean Air Act at the Centennial State Facility.

258.   Constructing the Centennial State, Hullabaloo, and Waste Management oil and gas production facilities without legally required nonattainment new source review air pollution permits violates the Colorado SIP and the Clean Air Act.

259.   Construction of the Centennial State Facility without legally required preconstruction compliance with MACT violates the Clean Air Act.

260.   The Centennial State Facility is not subject to any exemption under Section 112 of the Clean Air Act or Subpart HH.

261.   The Noble Facilities continue to produce oil and gas. Data from the Colorado Oil and Gas Conservation Commission indicates the Noble Facilities have produced and sold hundreds of thousands of barrels of oil and thousands of cubic feet of natural gas since being constructed.

262.    Noble continues to operate the Centennial State, Hullabaloo, and Waste Management Facilities without having legally required preconstruction permits, reaping enormous economic benefits.

263.    If Noble had complied with nonattainment new source review requirements and applicable MACT requirements, the company would already be meeting more stringent pollution controls and would have prevented many months of unpermitted emissions.

264.    If Noble had complied with nonattainment new source review requirements, it would be achieving a net decrease in emissions due to nonattainment new source review offset requirements.

265.    Noble has not offset emissions from its Facilities consistent with the Colorado SIP.

266.    For every ton of added VOC emissions from its Facilities, Noble was required to reduce emissions from another source or sources by 1.15 tons. AQCC Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05 Part D V.A.3.a(i)(b)).

267.    Neither the EPA nor the State of Colorado has commenced an enforcement action in federal or state court over Noble's violations of the SIP and the Clean Air Act at the Noble Facilities.

268.    On February 20, 2019, Guardians notified Noble via certified mail of its intent to pursue a citizen enforcement action in federal court over the violations at its Facilities. According to certified mail green return receipts, Noble received the notice on February 25, 2019. The notice was also served by certified mail upon Noble's Registered Agent, as well as to

the EPA Administrator, the EPA Regional Administrator, the Governor of Colorado, and the Director of CDPHE.

269.    In the notice, Guardians requested Noble cease operations at its Facilities and come into compliance with the Clean Air Act.

270.    Noble has not responded to Guardians' notice letter.

**G.** ***PDC's Facilities are Major Sources of Emissions Constructed and Operating in the Denver Metro-North Front Range Nonattainment Area Unlawfully in Violation of the Colorado SIP and Clean Air Act.***

271.    The PDC Facilities were constructed in Weld County, Colorado, within the Denver Metro-North Front Range 8-hour ozone nonattainment area.

272.    They are generally located near Greeley, Colorado.



Fig. 8. Map of the location of PDC's facility based on coordinates provided in company's Annual Pollutant Emission Notices.

273.    PDC began construction at the Sandin Facility on or around December 2017.

274.    The Sandin Facility began operation (i.e., first started producing oil and gas) on or about August 13, 2018.

275.    PDC applied for a synthetic minor source air pollution permit from the APCD for its Sandin Facility on or about November 8, 2018.

276.    PDC began construction at the Ward Facility on or around February 2017.

277.    The Ward Facility began operation on or about October 4, 2018.

278.    PDC applied for a synthetic minor permit for the Ward Facility on or about December 8, 2018.

279.    PDC has not received all necessary permits from the APCD under the Colorado SIP and the Clean Air Act for its Facilities.

280.    Actual construction began at the PDC Facilities prior to their first date of production.

281.    PDC did not submit applications for nonattainment new source review permits for the PDC Facilities prior to construction.

282.    The PDC Facilities each have the potential to emit more than 100 tons per year of VOCs.

283.    The Sandin Facility also has the potential to emit greater than 25 tons of hazardous air pollutants from storage vessels. Both of PDC's Facilities also have the potential to

emit more than 10 tons per year of n-hexane, a hazardous air pollutant listed under the Clean Air Act, from storage vessels.

284.   The Sandin and Ward Facilities, particularly due to oil and/or condensate tanks and gas venting there, have the potential to emit more than a thousand tons per year of VOCs.

285.   PDC was required to obtain preconstruction nonattainment new source review permits, as well as comply with MACT requirements, prior to beginning actual construction of its Facilities.

286.   According to PDC's own admissions in its permit applications and certified emission notices submitted to the APCD, the PDC Facilities have the potential to emit as follows:

| Facility | Potential to Emit for VOCs (tons/year) | Total Potential to Emit for Hazardous Air Pollutants From Storage Vessels (tons/year) | Total Potential to Emit for n-Hexane From Storage Vessels (tons/year) |
|---|---|---|---|
| Sandin 24 Sec HZ | 1,526.39 | 41.33 | 30.56 |
| Ward 20 Sec HZ | 1,282.11 | 24.69 | 18.89 |

287.   The PDC Facilities have continued to operate and release air pollution since they were first constructed.

288.   The PDC Facilities are currently operating without any federally enforceable limits on air pollution, meaning there is no exemption that otherwise disqualifies them as major sources under nonattainment new source review and hazardous air pollutant requirements.

289.    The PDC Facilities are currently actual major sources of VOC emissions and hazardous air pollutants.

290.    PDC constructed and is now operating its Facilities as major sources of VOCs and hazardous air pollutants.

291.    In its synthetic minor source permit applications, PDC seeks to establish federally enforceable limits to reduce potential emissions below major source thresholds at its Facilities.

292.    Federally enforceable limits cannot now apply to PDC's operations to reduce its potential emissions below major source thresholds.

293.    To this day, PDC does not have legally required permits to pollute at its Facilities and is not complying with nonattainment new source review requirements under the Colorado SIP, as well as hazardous air pollution limits set forth under Section 112 of the Clean Air Act.

294.    Constructing the Sandin and Ward Facilities without legally required nonattainment new source review air pollution permits violates the Colorado SIP.

295.    Construction of the PDC Facilities without complying with MACT limits on toxic air pollution also violates the Clean Air Act.

296.    The PDC Facilities are not subject to any exemption under Section 112 of the Clean Air Act or Subpart HH.

297.    The PDC Facilities continue to produce oil and gas. Data from the Colorado Oil and Gas Conservation Commission indicates the PDC Facilities have produced and sold hundreds of thousands of barrels of oil and thousands of cubic feet of natural gas since being constructed.

298. PDC continues to operate the PDC Facilities without having legally required preconstruction permits, reaping enormous economic benefits.

299. If PDC had complied with nonattainment new source review requirements and applicable MACT requirements, the company would already be meeting more stringent pollution controls and would have prevented many months of unpermitted emissions.

300. If PDC had complied with nonattainment new source review requirements, it would be achieving a net decrease in emissions due to nonattainment new source review offset requirements.

301. PDC has not offset emissions from its Facilities consistent with the Colorado SIP.

302. For every ton of added VOC emissions from the PDC Facilities, PDC was required to reduce emissions from another source or sources by 1.15 tons. AQCC Regulation No. 3, Part D, Section V.A.3.a(i)(b) (5 Colo. Code Regs. § 1001-05 Part D V.A.3.a(i)(b)).

303. Neither the EPA nor the State of Colorado has commenced an enforcement action in federal or state court over PDC's violations of the SIP and the Clean Air Act at the Facilities.

304. On February 20, 2019, Guardians notified PDC via certified mail of its intent to pursue a citizen enforcement action in federal court over the violations at its Facilities. According to certified mail green return receipts, PDC received the notice on February 22, 2019. The notice was also served by certified mail upon PDC's Registered Agent, as well as to the EPA Administrator, the EPA Regional Administrator, the Governor of Colorado, and the Director of CDPHE.

305. In the notice, Guardians requested PDC cease operations at the PDC Facilities and come into compliance with the Clean Air Act.

306.    PDC has not responded to Guardians' notice letter.

## V. CLAIMS

### FIRST CAUSE OF ACTION

(Defendants Extraction, Bonanza, Crestone, Great Western, Mallard, Noble, and PDC)

*Violation of Nonattainment New Source Review Requirements: Beginning Actual Construction Without Nonattainment New Source Review Preconstruction Permits*

307.    Guardians realleges and incorporates Paragraphs 1 through 306.

308.    Defendants began actual construction of their respective oil and gas production facilities, which are all major sources of VOC emissions, in the Denver Metro-North Front Range ozone nonattainment area before obtaining nonattainment new source review preconstruction permits required by the Colorado SIP and the Clean Air Act.

309.    Accordingly, Defendants are in violation of the Colorado SIP at AQCC Regulation No. 3, Part D, the Clean Air Act at 42 U.S.C. § 7503, and Clean Air Act regulations at 40 C.F.R. § 51.165.

### SECOND CAUSE OF ACTION

(Defendants Extraction, Bonanza, Crestone, Great Western, Mallard, Noble, and PDC)
*Operating in Violation of Nonattainment New Source Review Requirements*

310.    Guardians realleges and incorporates paragraphs 1–309.

311.    Defendants are now operating their respective oil and gas production facilities with no air pollution permits, in violation of the Colorado SIP and the Clean Air Act.

312.    Defendants are operating their facilities in violation of nonattainment new source review requirements under the Colorado SIP at AQCC Regulation No. 3, Part D, Section V.A.7.a.

313.   In operating Defendants' Facilities without legally required nonattainment new source review permits, Defendants are failing to meet the operational requirements of nonattainment new source review as set forth in the Colorado SIP at AQCC Regulation No. 3, Part D, Section V.A. Among other things, Defendants have failed and continue to fail to:

    a.    Achieve the lowest achievable emission rates at their facilities.

    b.    Certify that they are in compliance at "all other existing major stationary sources owned, operated, or controlled" by the company.

    c.    Achieve a net decrease in emissions due to nonattainment new source review offset requirements.

    d.    Offset emissions from their facilities consistent with the Colorado SIP.

    e.    Offset VOC emissions at a ratio of 1.15:1.

    f.    Analyze alternative sites, sizes, production processes, and environmental control techniques.

    g.    Demonstrate that emissions will not adversely impact visibility in Class I areas.

314.   Accordingly Defendants are in violation of nonattainment new source review operational requirements under the Colorado SIP at AQCC Regulation No. 3, Part D, Section V.A.7.a, under the Clean Air Act at 42 U.S.C. § 7503, and under Clean Air Act regulations at 40 C.F.R. § 51.165.

### THIRD CAUSE OF ACTION

(Defendants Bonanza, Crestone, Mallard, Noble, and PDC)

*Violation of Hazardous Air Pollutant Requirements: Constructing and Operating Major Sources Without Complying with Clean Air Act MACT Requirements*

315.    Plaintiff realleges and incorporate Paragraphs 1 through 314.

316.    Defendants variously constructed and began operating major sources of hazardous air pollutants without complying with applicable MACT requirements.

317.    Specifically, Bonanza, Crestone, Mallard, Noble, and PDC constructed and began operating one or more major sources of hazardous air pollutants without complying with applicable MACT requirements under the Clean Air Act.

318.    Bonanza, Crestone, Mallard, Noble, and PDC are in violation of the Clean Air Act at 42 U.S.C. § 7412(g)(2)(B) and Clean Air Act regulations at 40 C.F.R. §§ 63.5(b)(3)(i) and 63.760- 63.777.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.    Issue a declaratory judgment that Defendants have violated the Colorado SIP and Federal Clean Air Act by failing to obtain nonattainment new source review permits prior to beginning construction of their facilities;

B.    Issue a declaratory judgment that Defendants have violated the Colorado SIP and Federal Clean Air Act by failing to comply with nonattainment new source review operating requirements;

C.    Issue a declaratory judgment that Bonanza, Crestone, Mallard, Noble, and PDC have violated the Federal Clean Air Act by construction of major sources of hazardous air pollutants without complying with applicable MACT requirements;

D.      Order each Defendant to cease production and operations at its Facilities named herein unless and until it applies for and obtains nonattainment new source review permits for the Facilities;

E.      Order Bonanza, Crestone, Mallard, Noble, and PDC to cease production and operations at their Facilities unless and until they comply with applicable MACT requirements under the Clean Air Act at the Facilities;

F.      Order each Defendant to pay penalties of up to $99,681 per day for each of their own violations, as set forth in 84 Fed. Reg. 2056, 2059 (Feb. 6, 2019);

G.      Order that in lieu of some penalties, Defendants direct some funds toward beneficial mitigation projects in accordance with 42 U.S.C. § 7604(g)(2);

H.      Grant preliminary and/or permanent injunctive relief against each Defendant as appropriate;

I.      Award Guardians its costs, including reasonable attorneys' and expert witness fees, as authorized by Section 304 of the Clean Air Act, 42 U.S.C. § 7604(d); and

J.      Grant such other relief as the Court deems appropriate.

PLAINTIFF DEMANDS A JURY TRIAL.

Respectfully submitted this 3rd day of May, 2019.

LAW OFFICES OF RANDALL M. WEINER, P.C.

By:      */s/ Randall M. Weiner*
         Randall M. Weiner, #23871
         Annmarie Cording, #42524
         3100 Arapahoe Avenue, Suite 202
         Boulder, CO 80303
         Telephone: (303) 440-3321

FAX: (720) 292-1687
E-mail: randall@randallweiner.com

LAW OFFICES OF KATHERINE L.T. MERLIN

By: */s/ Katherine L.T. Merlin*
   Katherine L.T. Merlin
   3100 Arapahoe Ave., Suite 410
   Boulder, CO 80303
   Telephone: (720) 965-0854
   FAX: (720) 414-3132
   E-mail: kate@katemerlinlaw.com

   Attorneys for Plaintiff

WildEarth Guardians
516 Alto Street
Santa Fe, NM, 87501