**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-1286-RBJ

**WildEarth Guardians,**

       Plaintiff,

**v.**

**Extraction Oil & Gas, Inc.;
Bonanza Creek Energy Operating Company, LLC:
Crestone Peak Resources Operating, LLC;
Great Western Operating Company, LLC;
Mallard Exploration, LLC;
Noble Energy, Inc.; and
PDC Energy, Inc.,**

       Defendants.

---

## DEFENDANTS' JOINT MOTION TO DISMISS

---

Defendants Extraction Oil & Gas, Inc.; Bonanza Creek Energy Operating Company, LLC; Crestone Peak Resources Operating, LLC; Great Western Operating Company, LLC; Mallard Exploration, LLC; Noble Energy, Inc.; and PDC Energy, Inc. (collectively, "Operators") move to dismiss Plaintiff WildEarth Guardians' claims with prejudice.

## <u>INTRODUCTION</u>

This case rests on a legal fiction that Operators' facilities are "major sources" of air emissions, even though Colorado correctly issues "minor source" permits to such facilities under a long-standing, federally approved state air-permitting program. Plaintiff seeks to upend this State program by asking the Court to compel the Operators to obtain a "major source" permit even

though it is undisputed that each Operator has applied for—and, in many instances, already obtained—air permits that control emissions to levels below the major-source threshold. Plaintiff's novel legal theory contradicts the Clean Air Act and Colorado's State Implementation Plan; directly undermines decades of established regulatory requirements and industry practice; and will not further reduce any actual emissions at these facilities. Ultimately, the effect of Plaintiff's requested relief would be the immediate and unwarranted invalidation of Colorado's oil and gas air permitting program.

Plaintiff also ignores the program's well-established regulations that allow a 90-day permitting window for oil and gas facilities. Those regulations recognize that oil and gas facilities are unique because their level of air emissions cannot be determined with any accuracy until after a well has been drilled and production begins. In consideration of this unique industry characteristic, the Colorado program provides oil and gas facilities a limited period to monitor emissions, obtain facility-specific emissions data, and then apply for an appropriate air permit, all the while controlling emissions to a level below the threshold that would make a facility a "major source" of air emissions.

Because the facts pled in the Complaint demonstrate that the Operators complied with all applicable air-permitting regulations, Plaintiff's claims fail as a matter of law and must be dismissed for failure to state a claim upon which relief can be granted. In the alternative, the Court should abstain and allow Colorado's regulatory agencies to decide whether the Operators have complied with the applicable permitting and operating requirements.

**BACKGROUND**

## I.    PLAINTIFF'S CLAIMS

Plaintiff asserts three claims against the Operators, each premised on the contention that the facilities at issue are "major sources" of air emissions.  *See* Compl. ¶¶ 3, 307-318.  *First*, Plaintiff alleges the Operators constructed major sources of air emissions without first obtaining proper major-source air permits.  *Id.* ¶¶ 3, 307-309.  *Second*, Plaintiff alleges the Operators are operating major sources of air emissions without complying with major-source new source review ("NSR") requirements.  *Id.* ¶¶ 3, 310-314.  *Third*, Plaintiff alleges certain Operators failed to comply with other control requirements, known as the Maximum Available Control Technology ("MACT"), that apply to certain major sources.  *Id.* ¶¶ 3, 315-318.

## II.    LEGAL AND REGULATORY FRAMEWORK

The air permit application process in Colorado is straightforward and prescriptive.  In order to comply with the requirements of the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, and Colorado law, an operator of a new stationary oil and gas facility must:  (1) provide written notice to the State before doing any work at the proposed location; (2) obtain a drilling permit from the Colorado Oil and Gas Conservation Commission ("COGCC"); (3) after drilling the well, determine the level of oil and gas production, if any, that will result from the new well(s); (4) determine whether any reportable air emissions will result from the production; (5) determine which air permit application applies; and (6) file an Air Pollutant Emission Notice ("APEN") and an air permit application with the State.  From the day of first production, there are numerous controls on air emissions that apply to oil and gas facilities, and operators must comply with the

proposed emission limitations in their permit applications from the time the applications are filed. Once issued, the limitations in the permits govern the facilities' air emissions.

### A. Each state has responsibility for enacting and enforcing regulations needed to meet federal air-quality standards.

The CAA establishes a federal framework for ensuring the nation's air quality, while giving each state primary responsibility for regulating air quality within its borders. 42 U.S.C. § 7407(a). Under this cooperative-federalism scheme, the United States Environmental Protection Agency ("EPA") sets health-based standards for air emissions, 42 U.S.C. §§ 7407, 7409,[1] and states are responsible for achieving and maintaining compliance with these standards through a state implementation plan, or "SIP." 42 U.S.C.§ 7407(a)(1).

Each state has wide latitude to develop its SIP to meet particular air quality needs, including crafting regulations applicable to unique industries and emission sources. *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 470 (2004) ("States have 'wide discretion' in formulating their [state implementation] plans . . . ."). EPA approves or rejects proposed SIP regulations after a notice and comment period. 42 U.S.C. § 7410(a)(1)-(2). Before approving any SIP regulation(s), EPA must conclude that the SIP provisions comply with applicable CAA requirements. *See* 42 U.S.C. § 7410(k)(3); *Union Elec. Co. v. EPA,* 427 U.S. 246, 265 (1976).

The Colorado Department of Public Health and Environment ("CDPHE") administers Colorado's SIP through two sub-departments: the Air Quality Control Commission ("Commission") and the Air Pollution Control Division ("Division"). *See* § 25-7-105, C.R.S. The Commission develops rules and regulations regarding the construction, operation, and permitting

---

[1] These standards are known as National Ambient Air Quality Standards. 42 U.S.C. § 7407.

of stationary sources of air emissions, and the Division implements these rules and regulations. *See id*. The air permitting program is a key component of Colorado's SIP.

**B. Colorado's SIP governs the air permitting of new oil and gas facilities.**

Colorado's Regulation 3 governs the permitting of stationary sources of air emissions, including for oil and gas facilities. *See* 5 C.C.R. 1001-5 ("Regulation 3"). EPA has approved the portions of Regulation 3 relevant to Plaintiff's claims. *See* 76 F.R. § 61054 (approving Regulation 3, Part A § II.D.1.lll Sept. 16, 1997, June 20, 2003, July 11, 2005, Aug. 8, 2006, and Aug. 1, 2007); 62 F.R. § 2910 (approving Regulation 3, Part B § II.D.7 Nov. 12, 1993, Sept. 29, 1994, and Jan. 29, 1996). Plaintiff admits this fact. *See* Comp. ¶ 4.

1. *Air Pollutant Emission Notices ("APENs")*

Under Regulation 3, a facility operator must provide the State notice of a new source of air emissions by filing an APEN. *See* Regulation 3, Part A § II.B.3. Each APEN identifies the facility's emissions points and requires operators to calculate both "controlled" and "uncontrolled" emissions for each point. *See* Regulation 3, Part A § II.B.3. APENs are the first step in the air permitting process, but they are not air permits. Instead, APENs provide information to determine the type of air permit that will be required. While the APEN requires an estimate of "uncontrolled" emissions, that number does not determine what type of permit will be required.

2. *Major-Source and Minor-Source Permits*

In conjunction with filing the APEN, the operator of a new facility must apply for an air permit (referred to in Regulation 3 as a "construction permit"). The applicable permitting requirements for a given facility depend on whether the facility is a "major source" of air emissions. *Compare* Regulation 3, Parts A-B *with* Regulation 3, Part D. Colorado's SIP defines

"major source" as "any stationary source of air pollutants that emits, or has the potential to emit, 100 tons per year or more of any regulated pollutant." *See* Regulation 3, Part D § II.A.25.b.[2] A "minor source" is "any stationary source that does not qualify as a major source." *See* Regulation 3, § I.B.26.

### 3.    Potential to Emit ("PTE")

As noted above, a facility is considered a major source based on either (1) *actually* emitting pollutants over major-source thresholds or (2) having the "*potential to emit*" over major-source thresholds.   In this case, Plaintiff's claims are based entirely on the facilities' "potential to emit," or "PTE."

A facility's PTE is not based on the emissions it would theoretically have if no controls were in place.  Rather, the Colorado SIP defines PTE as "the maximum capacity of a stationary source to emit a pollutant *under its physical and operational design*."  Regulation 3, Part A § I.B.37 (emphasis added).  In addition:

> Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is state enforceable and federally enforceable.

*Id.*  In other words, any physical restriction or enforceable regulatory limitations that reduce the level of a facility's air emissions lowers PTE.  *See id.*  Thus, a facility that might have "uncontrolled" emissions over major-source thresholds will be considered a "minor source" if,

---

[2] A source is also considered "major" if it has the potential to emit 10 tons per year of any hazardous air pollutant ("HAP") or 25 tons per year of an aggregation of HAPs.  42 U.S.C. § 7412(a)(l).

considering physical restrictions and enforceable limitations, its PTE falls under major-source thresholds.[3] These facilities are called "synthetic minor sources." *See* Section II.C below.

### 4.    *Permitting Oil and Gas Facilities*

Regulation 3 provides that operators of oil and gas facilities that will generate reportable emissions have up to 90 days after first production to file an APEN and an air permit application. Regulation 3, Part A II.D.1.lll and Part B II.D.7.[4]  As the Division has recognized, requiring the submission and issuance of a permit before construction would be "impractical for oil and gas exploration and production sources since the amount of emissions, if any, is impossible to determine until after completion of the well and certain testing has occurred." CDPHE Prehearing Statement, Regulation 3 (Oct. 2002); *see also* Regulation 3, Statement of Basis, Specific Statutory Authority, and Purpose, adopted June 22, 1993 (explaining that it is "difficult for the owner or operator [of an oil and gas facility] to estimate what emission equipment will be required, and therefore what emissions will occur, until the exploration activities are already underway, and near completion.  For this reason, the Commission has extended a temporary exemption from APEN and permit requirements for such activities.").    This permitting window has been part of

---

[3] In its Complaint, Plaintiff repeatedly conflates a facility's "uncontrolled" emissions with the facility's PTE.  They are not the same.  A facility's "uncontrolled emissions" is a theoretical number that has nothing to do with the facility's classification as a major or minor source, or on the actual emissions that the facility will produce once it becomes operational.  Unlike a facility's "uncontrolled" emissions, PTE takes into consideration a variety of emissions limitations, including physical emission-control equipment, regulations that place enforceable restrictions on emissions, and self-imposed restrictions incorporated into a facility's air permit(s).  *See* Regulation 3, Part A § I.B.37.

[4] In 1993, the period for filing an APEN was 30 days.  Regulation 3 was amended in 2002 to extend the 30-day time frame to the current 90 days.  *Compare* Regulation 3 (2001) *with* Regulation 3 (2002).

Colorado's air-quality permitting program for over 25 years and has been approved by EPA as consistent with the permitting provisions of the CAA.

Even though oil and gas facilities have 90 days from first production to file an APEN and air permit application, they are required to control air emissions from the first day of operation pursuant to detailed regulatory controls. *See generally* 5 C.C.R. § 1001-9 (discussing numerous state air emissions restrictions applicable to oil and gas facilities). Moreover, Regulation 3 requires each facility to control emissions as set forth in the air permit application during the entire period that the application is pending. *See* Regulation 3, Part B § II.D.7. As a result, oil and gas facilities are strictly regulated from the first day of operations.

### C. A facility may be permitted as a "synthetic minor source" if its PTE is below major-source thresholds.

Both the Colorado SIP and the federal CAA allow facilities that would otherwise be classified as major sources to voluntarily lower their PTE through emissions limitations in their air permits requiring them to stay below major-source thresholds. *See* Regulation 3, Part B § II.A.7; EPA, *Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act* (Jan. 25, 1995) ("*Options for Limiting PTE*").[5] Thus, a source that might otherwise be a major source without any limitations is not subject to major-source requirements if it adopts emissions limitations in an enforceable air permit that lowers the source's PTE below major-source thresholds. Such sources are referred to as "synthetic minor sources." *See* Regulation 3, Statement of Basis, Statutory Authority, and Purpose, adopted July 15, 1993. EPA and the courts have long recognized synthetic minor source permits as a desirable

---

[5] *Available at* https://www.epa.gov/sites/production/files/documents/limit-pte-rpt.pdf.

means of reducing a source's PTE below major-source thresholds.  *See, e.g., Minor NSR Basic Information*, ("[M]inor NSR permits often contain permit conditions to limit the sources['] emissions to avoid [major-source requirements].")[6]; *Nw. Envtl. Def. Ctr. v. Cascade Kelly Holdings LLC*, 155 F. Supp. 3d 1100, 1107 n.9 (D. Or. 2015) ("EPA regulations contemplate SIPs that allow sources to adopt synthetic caps on their potential to emit.").

## III.   UNDISPUTED FACTS AND REGULATORY HISTORY

The basic facts underlying Plaintiff's claims are undisputed.  Plaintiff acknowledges  that all of the facilities at issue are oil and gas facilities (Compl. ¶¶ 17, 19, 21, 23, 25, 27, and 29), that these facilities "consist of oil and gas wells and related production facilities" (*id*. ¶¶ 17, 19, 21, 23, 25, 27, and 29), and that the Operators applied for synthetic minor source air permits for each of the facilities at issue (*id.* ¶¶ 60, 63, 66, 96, 99, 102, 105, 138, 171, 201, 234, 237, 240, 275, and 278).  The Complaint contains no allegations that the Operators failed to apply for air permits or that they have failed to comply with the terms of their permits or permit applications.

In February 2019, Plaintiff sent notices of intent to sue letters with respect to each of the facilities at issue in this case.  After that, Plaintiff publicly commented on several of the permit applications for the facilities at issue, asserting the same arguments it asserts in this case.  The Division recently responded to these comments, unequivocally rejecting Plaintiff's arguments and finding that the Operators have fully complied with the relevant SIP requirements.  *See* Argument Section I.C below.  Before Plaintiff filed its Complaint, the Division approved Great Western's permits.  *See* Great Western's Motion to Dismiss.  Since then, the Division has issued permits for

---

[6] *Available at* https://www.epa.gov/nsr/minor-nsr-basic-information.

seven more of the facilities at issue in this case.[7]  It appears from the Division's responses that it

will soon issue air permits for the remaining seven facilities.

## LEGAL STANDARDS

Rule 12(b)(6) permits the Court to dismiss for "failure to state a claim upon which relief

can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss tests "the sufficiency of the

allegations within the four corners of the complaint after taking those allegations as true."  *Mobley*

*v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  The ultimate question is "whether the complaint

sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief

under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir.

2007).

"Rule 12(b)(1) provides for challenges to a court's subject matter jurisdiction."  *Kenney v.*

*Helix TCS, Inc.*, 284 F. Supp. 3d 1186, 1188 (D. Colo. 2018).  Motions to dismiss based on

abstention and primary jurisdiction grounds are decided under Fed. R. Civ. P. 12(b)(1).  *See, e.g.*,

*Sierra Club v. Chesapeake Operating, LLC*, 248 F. Supp. 3d 1194, 1199 (W.D. Okla. 2012).  "The

---

[7] Air permits issued by the Division are public documents, which can typically be downloaded from the Division's "WebDrawer" website, at https://environmentalrecords.colorado.gov/HPRMWebDrawer/Search.  For the Court's convenience, the Operators have attached copies of the issued permits as Exhibits A through D. Great Western's permits are attached to its separate motion to dismiss.  The Court may take judicial notice of the Operators' air permits without converting the motion into a motion for summary judgment as the permits are public documents.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts may consider "matters of which a court may take judicial notice" on a motion to dismiss); *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("[O]n a motion to dismiss . . . we are not precluded in our review of the complaint from taking notice of items in the public record.").

decision to abstain is largely committed to the discretion of the district court." *Ramos v. Lamm*, 639 F.2d 559, 564 n.4 (10th Cir. 1980).

## ARGUMENT

Plaintiff's claims should be dismissed for two reasons. *First*, Plaintiff's claims are predicated on the incorrect legal conclusion that the Operators were required to apply for major-source permits and comply with major-source operating requirements even though they have properly applied for synthetic minor source permits under Colorado's SIP. Plaintiff's contention is contrary to established federal and Colorado law. Even accepting all of Plaintiff's factual allegations in the Complaint as true, Plaintiff has not pled a violation of the Colorado SIP or CAA. Plaintiff's claims should therefore be dismissed.

*Second*, in the alternative, well-established principles of judicial deference support abstention from deciding any portion of Plaintiff's claims. Federal courts generally defer to state agencies and state courts where, as here, a litigant mounts a collateral attack on a state's implementation of its own regulatory scheme. This is particularly true where state courts have concurrent jurisdiction, where the regulations serve important state policy interests, and where creation and enforcement of the regulations require substantial technical expertise. All of these considerations are present here and warrant abstention.

## I.   PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE THE OPERATORS HAVE COMPLIED WITH ALL SYNTHETIC MINOR SOURCE PERMITTING REQUIREMENTS IN THE COLORADO SIP.

In order to prevail on its first claim, Plaintiff must prove, among other things, that the Operators were required to obtain major-source permits before constructing their facilities. In order to prevail on its second and third claims, Plaintiff must prove that, among other things, the

Operators were required to comply with certain major-source operational requirements (specifically, NSR and MACT requirements). Because the Operators all properly filed synthetic minor source permit applications in compliance with Colorado's SIP, Plaintiff cannot establish these essential elements of its claims. This is a purely legal issue, and Plaintiff's arguments fail as a matter of law.

*First*, Plaintiff completely ignores the EPA-approved Colorado SIP provisions in Regulation 3 that allow oil and gas facilities to submit permit applications 90 days after first production rather than before construction. *Second*, the SIP's plain language and its underlying purpose preclude the Operators from having to simultaneously comply with both the synthetic minor source and major-source permitting requirements. *Third*, the State has unequivocally rejected the exact arguments Plaintiff asserts, and the State's interpretation of its own regulations should be given substantial deference.

### A. The Operators applied for air permits in compliance with SIP requirements.

Generally, a facility owner must obtain an air permit before commencing construction. Regulation 3, Part B § II.A.1. Operators of oil and gas facilities, however, "are not required to file an application for a construction permit until they are required to file an [APEN]." Regulation 3, Part B § II.D.7. Oil and gas facilities are not required to file an APEN until 90 days after first production. *Id.*, Part A § II.D.1.lll. Accordingly, the owner of an oil and gas facility is not required to submit an air permit application prior to construction, but rather complies with the Colorado SIP by submitting the application within 90 days of first production. Plaintiff's contention that the Operators violated the SIP or the CAA by not obtaining air permits before construction of their facilities is therefore directly contradicted by the plain language of the SIP.

**B. Operators are not obligated to comply with major-source permitting or operational requirements if they are applying for synthetic minor source permits.**

Plaintiff asserts—without explanation or supporting authority—that "[a] synthetic minor permit does not substitute for a permit for a major stationary source of air pollution." Compl. ¶ 43. Based on this faulty premise, Plaintiff acknowledges the Operators' synthetic minor source permit applications, but argues that these permits cannot reduce the PTE for their facilities below major-source thresholds. *See id.* ¶¶ 78-79, 118-19, 151-52, 183-84, 214-15, 254-55, 291-92. To the contrary, reducing PTE to below major-source thresholds is the very purpose of obtaining a synthetic minor source permit.

As an initial matter, Plaintiff's interpretation of the SIP constitutes a legal conclusion. *See DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 724 n.15 (10th Cir. 1988) (interpretation of a regulation constitutes a question of law). Under Rule 12(b)(6), factual allegations are accepted as true, but legal conclusions are not. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). And Plaintiff's legal conclusions are wrong.

Determining whether a facility is a major source depends on its PTE. PTE is not calculated based on "uncontrolled" emissions, as Plaintiff suggests, but on controlled emissions, considering enforceable operational and physical emission limitations. *See* Regulation 3, Part A § I.B.37. Under the Colorado SIP, an operator can agree to restrict its emissions as set forth in an enforceable air permit and these restrictions will reduce the PTE for that facility. *See* EPA, *Options for Limiting PTE* at 1 ("[I]n situations where unrestricted operation of a source would result in a potential to emit above major-source levels, such sources may legally avoid program requirements by taking federally-enforceable permit conditions which limit emissions to levels below the

applicable major source threshold."). Colorado's SIP implements this concept by allowing facilities to voluntarily achieve synthetic minor source status through emissions controls in an air permit:

> A source that is voluntarily applying for a permit to create state-only or federally enforceable permit conditions, as appropriate, to limit the potential to emit criteria pollutants, GHG or hazardous air pollutants may request to obtain such limits in a construction permit.

Regulation 3, Part B § II.A.7.

Nothing in the SIP requires a facility owner that has applied for a synthetic minor source permit under Regulation 3 to simultaneously comply with major-source permitting or operational requirements—nor would such a requirement make sense. Among other things, the Operators would at once be prohibited from construction and operation prior to receipt of an air permit (i.e., the major-source program) and yet be allowed to construct and operate using the 90-day permitting window prior to receipt of an air permit (i.e., the synthetic minor source program). Such a dual-permitting track would also needlessly waste the time and efforts of the State and applicants by creating twice as many air permit applications. And, ultimately, such an interpretation of the SIP would render the synthetic minor source permitting program meaningless as it would provide no benefit or incentive to operators to lower their facilities' emissions. *See Straub v. BNSF Railway Co.*, 909 F.3d 1280, 1287 n.8 (10th Cir. 2018) ("[W]e must strive to interpret . . . regulations as a whole in a manner so as to avoid a construction that renders a portion of the regulations superfluous.").

Because Plaintiff's claims rely on an interpretation of the SIP that is wrong as a matter of law, they should be dismissed.

**C. The Division's interpretation of the SIP must be given deference.**

Plaintiff recently made public comments on several pending permit applications, advancing the same arguments as in this case. *See* Exhibit E, Attachment 1 at 1 (summarizing the claims Plaintiff asserted in its public comments).[8] In response, the Division unequivocally rejected Plaintiff's interpretation of the SIP. *See id.* ("The division disagrees with each of the arguments posed by WildEarth Guardians.").[9] Specifically, the Division found that the Operators "applied for a minor source construction permit in accordance with the provisions of Regulation 3 . . . while also complying with enforceable emissions limits and controls from the first day of production." *Id.* at 3. The Division also rejected Plaintiff's argument that the Division could not issue synthetic minor source permits to the Operators because the Operators did not apply for and obtain such permits before beginning construction. The Division explained that (1) only facilities whose actual emissions will ultimately exceed major-source thresholds—as opposed to those that will operate as synthetic minor sources—are required to obtain air permits before construction begins, and (2) regardless of whether a facility would have qualified as a major source at one time, the Division has the authority to later issue a synthetic minor source permit that includes sufficient controls to lower that facility's PTE below major-source thresholds. *Id.* at 2-3.

---

[8] On July 17, 2019, the Division responded to Plaintiff's comments on 24 different permit applications—seven of which concern oil and gas facilities at issue in this case  The seven responses that directly address the facilities at issue in this case are attached

in Exhibit E.   The responses are also publicly available online through the Division's "WebDrawer" website, at https://environmentalrecords.colorado.gov/HPRMWebDrawer/Search.

[9] The Court may take judicial notice of an agency's interpretation of its own regulations on a motion to dismiss. *See, e.g., Boldozier v. Am. Family Mut. Ins. Co.*, 375 F. Supp. 2d 1089, 1092 (D. Colo. 2005); *Torres v. Ridgewood Bushwick Senior Citizens Homecare Council Inc.*, No. 08-CV-3678CBA, 2009 WL 1086935, at **4-5 (E.D.N.Y. Apr. 22, 2009); *Moroz v. Alexico Corp.*, No. CIV.A.07-3188, 2008 WL 109675, at **2-4 (E.D. Pa. Jan. 7, 2008).

The Division's comments are consistent with how the SIP has been understood by the industry, acknowledged by the Commission, and enforced by the Division for decades. Moreover, "considerable respect is due 'the interpretation given [a] statute by the officers or agency charged with its administration.'" *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980) (quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)). "An agency's construction of its own regulations has been regarded as especially due that respect." *Id.* This deference extends to the agency's application of its regulations to a specific set of facts. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council,* 557 U.S. 261, 283 (2009) ("[W]e do find that agency interpretation and agency application of the regulations are instructive and to the point."). This is because "[a]dministrative agencies are simply better suited than courts to engage in such a process." *Ford Motor Credit Co.*, 444 U.S. at 569; *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."). And a state agency administering a federal program is entitled to the same level of deference as a federal agency. *United States v. Alcoa, Inc.,* No 1:03–cv–222, 2007 WL 5272187, at *7 (W.D. Tex. Mar.14, 2007), *aff'd,* 533 F.3d 278 (5th Cir. 2008) ("a district court reviews the actions of a state agency administering federal programs as it would review the actions of a federal agency, including deference to reasoned administrative action" (citing *Indep. Nursing Home v. Simmons,* 732 F. Supp. 684, 688 (D. Miss. 1990)).

Colorado's SIP provides a highly technical regulatory program for controlling air emissions state-wide. The Division has the scientific and technical expertise to both propose

regulations to comply with the mandates of the CAA and state legislature, and to determine how best to interpret and enforce those regulations.  The Court should therefore defer to the Division's interpretation of the Colorado SIP as expressed in the attached letters and reject Plaintiff's unsupported interpretation that is inconsistent with the plain language and underlying purposes of Regulation 3.[10]

## II.   IN THE ALTERNATIVE, THE COURT SHOULD ABSTAIN FROM CONSIDERING PLAINTIFF'S CLAIMS AND DISMISS THE ACTION.

For the reasons explained above, the Court should dismiss Plaintiff's Complaint for failure to state a claim.  *See* Section I *supra*.  In the alternative, the Court should abstain from considering and dismiss Plaintiff's claims under *Burford* abstention or under the doctrine of primary jurisdiction.

### A.  The Court should abstain from considering Plaintiff's claims under *Burford*.

The Court should abstain from considering Plaintiff's claims under *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943), because Plaintiff's claims amount to a collateral attack on the state SIP and administering the SIP involves complex policy issues best left to the Division.

1.   *Colorado's Administrative and Judicial Review Processes Support Abstention Under* Burford*.*

Federal courts are not the proper forum for collateral attacks on administrative programs delegated to the states.  *See Burford,* 319 U.S. at 333-34.  For this reason, "federal courts may decline to exercise their jurisdiction . . . where denying a federal forum would clearly serve an

---

[10] While the Operators do not believe the relevant SIP provisions are ambiguous, even if they were, deference to the Division's interpretation of the SIP would be appropriate.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (agency's interpretation of its own ambiguous regulation is "controlling unless plainly erroneous or inconsistent with the regulation" (citation omitted)); *Kisor v. Wilkie*, --- U.S. ----, 2019 WL 2605554, **8-10 (June 26, 2019) (reaffirming *Auer*).

important countervailing interest, . . . [including proper] regard for federal-state relations, or wise judicial administration." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716 (1996) (citations omitted).  Abstention is particularly appropriate where adequate state-court review is available and where federal review would disrupt state efforts to establish a coherent policy.  *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 360-61 (1989) ("*NOPSI*") (describing core elements of *Burford* abstention).  *Burford* abstention prevents litigants from taking "multiple bites of the apple by [not] allowing them to fight the battle on two fronts." *Nat. Res. Def. Council v. BP Prods. N. Am., Inc.*, No. 2:08–CV–204 PS, 2009 WL 1854527, at *11 (N.D. Ind. June 26, 2009).

Based on these principles, federal courts frequently have abstained in cases involving collateral attacks on federally delegated programs under complex environmental statutes.  *See, e.g., Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 481 (6th Cir. 2004) (abstaining where litigant's claims "boil[ed] down to allegations that the [state] agency 'failed or misapplied [its] lawful authority under [state] law and under' the Clean Air Act" (citation omitted)); *Sugarloaf Citizens Ass'n v. Montgomery Cty., Md.*, 33 F.3d 52, 1994 WL 447442, at *4 (4th Cir. Aug. 17, 1994) (*Burford* abstention warranted where there is "a complex and systematic [state] process to evaluate facilities which will have an impact on the environment" (citation omitted)); *Nat. Res. Def. Council*, 2009 WL 1854527, at **16-17) (abstaining from review of Indiana's minor-source air permit program).  Abstention is particularly appropriate given the CAA's cornerstones of cooperative federalism and state delegation.  *See* 42 U.S.C. § 7401(a)(3) (air-pollution control "is the primary responsibility of States and local governments"); *accord Train v. Nat. Res. Def.*

*Council, Inc.*, 421 U.S. 60, 79-80 (1975); *Oklahoma v. EPA*, 723 F.3d 1201, 1204 (10th Cir. 2013); *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012).

This Court abstained under *Burford* when dismissing Plaintiff's prior challenge to Colorado's air-permitting process. *See, e.g., WildEarth Guardians v. Pub. Serv. Co.,* 698 F. Supp. 2d 1259, 1264-65 (D. Colo. 2010). There, Plaintiff "participated in the permitting process and procedures that exist for it to obtain review; including if appropriate, judicial relief through the state system" with respect to an air-emissions permit application. *Id*. at 1264. Invoking *Burford*, the Court acknowledged Colorado's "comprehensive review process" and refused to "interfere with" the State's "on-going administrative and potential judicial review." *Id*.

The same circumstances apply here, where Plaintiff has challenged the state's permitting process at the agency level, and thereby set the stage for potential state judicial review. *See* §§ 24-4-106, 25-7-120, C.R.S. Specifically, Plaintiff commented to the Division on the Operators' draft permits, asserting that issuance of a final permit would be unlawful. *See* Exhibit E, Attachment 1 at 1 (summarizing the claims Plaintiff asserted in its public comments). Plaintiff's comments to the state agency, including legal theories, are nearly identical to the allegations in its Complaint. *See id.* Once the agency has issued or denied the permit application, Plaintiff may avail itself of state-court judicial review. Plaintiff's conduct raises the same concerns previously voiced by this Court in *WildEarth Guardians*, including the existence of potential state judicial review by virtue of Plaintiff's participation in the air-permitting administrative process. *See* 698 F. Supp. 2d at 1264-65. A multi-front battle, with all of its inefficiencies, supports dismissal based on *Burford* abstention. *See id.*; *accord Ellis*, 390 F.3d at 480-81.

  2. *The complexities and importance of Colorado's air-permitting process support abstention under* Burford.

"Burford abstention [also] arises when a federal district court faces issues that involve complicated state regulatory schemes." *Lehman v. City of Louisville*, 967 F.2d 1474, 1478 (10th Cir. 1992).  In such instances, "federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford*, 319 U.S. at 318.  Abstention under *Burford* likewise is appropriate where the federal action implicates complex and important state policy matters.  *See, e.g., NOPSI*, 491 U.S. at 360-61.  As this Court noted in *WildEarth*, "[c]oncurrent review by an inexpert federal court could be disruptive of Colorado's efforts to establish a coherent policy concerning emissions of pollutants from power plants."  698 F. Supp. 2d at 1264-65.

As explained above, air-quality regulation is a "complex environmental regulatory scheme." *Nw. Envtl. Def. Ctr. v. Owens Corning Corp.*, 434 F. Supp. 2d 957, 961 (D. Or. 2006).  The CAA delegates the primary responsibility for implementing this complicated scheme to the states.  *See* 42 U.S.C. § 7401(a)(3).  In simple terms, "[a]fter EPA sets numerical air-quality benchmarks, 'Congress plainly left with the States . . . the power to determine which sources would be burdened by regulation and to what extent.'" *E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 537-38 (2014) (citations omitted).

Colorado law reflects this cooperative federalism framework.  *See* § 25-7-102, C.R.S. (stating "the prevention, abatement, and control of air pollution in each portion of the state are matters of statewide concern and are affected with a public interest").  To address the complex public interests surrounding air quality, Colorado has adopted comprehensive regulations that balance competing economic, environmental, and natural resource values.  *See* § 25-7-101, C.R.S.

*et seq.*  These regulations span hundreds of pages and involve many complex, technical issues. *See* C.C.R. § 1001-1 *et seq.*

Plaintiff acknowledges these complexities surrounding Colorado's regulatory programs, and that they require an in-depth knowledge of air-quality technology and the regulatory regime. *See, e.g.*, Compl. ¶¶ 34-39, 42, 44-48.  Plaintiff's challenge to Colorado's longstanding permitting framework implicates complex and important state policy considerations reaching back decades, which support abstention.  *See Sugarloaf Citizens Ass'n*, 1994 WL 447442, at *4.

In addition to presenting complex policy issues left to the States, litigating Plaintiff's Complaint "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *NOPSI*, 491 U.S at 361.  Like many states, Colorado recognizes the importance of a coherent air-permitting policy for oil and natural gas sources.  *See* § 25-7-102, C.R.S.  Following the state legislature's lead, the Commission's rules state explicitly that it "intends to enforce its rules and regulations uniformly and equitably while ensuring that the goals of the air-quality program it has adopted are not compromised."  C.C.R. § 1001-1:I.

Under similar circumstances, federal courts have abstained from considering collateral attacks on state air-quality permits where necessary to preserve state policy.  *See, e.g., Ellis*, 390 F.3d at 481 ("'[F]ederal review at this juncture would be disruptive of Kentucky's effort to establish a coherent policy' with respect to PSD permitting of emitting facilities . . . ." (citation omitted)); *Sugarloaf Citizens Ass'n,* 1994 WL 447442, *4 ("The exercise of federal jurisdiction over [the state agency]'s permitting decisions would disrupt Maryland's complex statutory scheme and frustrate the State's efforts to establish a coherent environmental policy, thereby warranting *Burford* abstention . . . .").  As one district court rhetorically asked when invoking *Burford*

abstention, "[w]hat is the point of having an expert agency appeals process—or a state court appeals process—if litigants can simply side-step it by turning to the federal courts?" *Nat. Res. Def. Council, Inc.*, 2009 WL 1854527, at *11.[11]  Plaintiff's Complaint triggers the same inquiry.

Plaintiff's requested relief would invalidate Colorado's air-permitting regulatory regime for the oil and gas production industry, not just the individual Operators subject to this lawsuit. *See* Compl. at Prayer for Relief, ¶¶ A, B, C and E.  Abstention is required to avoid this outcome. *See WildEarth*, 698 F. Supp. 2d at 1264-65.

## B. The Court should refrain from adjudicating and dismiss Plaintiff's claims under the doctrine of primary jurisdiction.

Federal courts generally dismiss or stay federal claims otherwise being addressed by state agencies with specialized expertise. *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1238 (10th Cir. 2007).  This "primary jurisdiction" doctrine is rooted in the Court's discretionary powers. *Reiter v. Cooper,* 507 U.S. 258, 268–69 (1993).

Primary jurisdiction is properly invoked where "the case will require resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body." *Marshall v. El Paso Nat. Gas Co.*, 874 F.2d 1373, 1376 (10th Cir. 1989).  This allows a court to refer matters "extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Williams Pipe Line Co. v. Empire Gas Corp.,* 76 F.3d 1491, 1496 (10th

---

[11] These considerations also support abstention under the similar doctrine announced in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817-18 (1976).  Like *Burford*, *Colorado River* applies to "situations involving the contemporaneous exercise of concurrent jurisdictions," and supports federal abstention based on "conservation of judicial resources and comprehensive disposition of litigation." *Id.* at 817 (citations and internal quotation omitted).

Cir. 1996) (citations omitted).   "[C]ourts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency."   *Id.*

Dismissal is appropriate where the issues "(1) are not within the conventional experience of judges; (2) require the exercise of administrative discretion; or (3) require uniformity and consistency in the regulation of the business entrusted to the particular agency." *TON Servs.*, 493 F.3d at 1329 (quoting *Crystal Clear Comms. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1179 (10th Cir. 2005)).   "Additionally, when the regulatory agency has actions pending before it which may influence the instant litigation, invocation of the doctrine may be appropriate." *Id.*   "There is, however, no 'fixed formula . . . for applying the doctrine,'" and "[c]ourts should consider case-by-case whether 'the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* (citations omitted).

Plaintiff's claims should be dismissed and the Division allowed to address any concerns regarding the air permits the Operators have applied for.   The Division, as authorized by the State and CDPHE, is the primary agency responsible for regulating the subject matter of Plaintiff's claims.   *See* § 25-7-105, C.R.S.   Whether and to what extent a facility is subject to major-source requirements is a highly technical question that the Division reviews, investigates, and determines regularly.   *See generally* Regulation 3.   The Division's expertise is unique, and its regulatory actions are inextricably involved in addressing the issues posed by Plaintiff.   The Division actively and diligently exercises its authority over the Operators and all other stationary-source operators by accepting permit applications, reviewing them for major-source classification, and issuing permits based upon its conclusions from that review.   *See id.*   These circumstances support deference to the Division.   *See TON Servs.*, 493 F.3d at 1329.

### III.   TO THE EXTENT PLAINTIFF IS CHALLENGING THE VALIDITY OF COLORADO'S SIP ITSELF, PLAINTIFF'S CLAIMS ARE BARRED.

Plaintiff's claims are based on the (incorrect) notion that the Operators have violated the Colorado SIP.  *See* Section I *supra*.  To the extent Plaintiff claims that the SIP *itself* is inconsistent with or violates the federal CAA, Plaintiff does not have standing to assert such a claim.  A private citizen may challenge EPA's approval of a SIP, but only within 60 days of that approval.  42 U.S.C. § 7607(b).  Here, the relevant provisions of the SIP were approved by EPA decades ago.  *See* 76 F.R. 61054; 62 F.R. 2910.  If Plaintiff wanted to mount a legal challenge to the regulatory program enacted through the Colorado SIP, the time to do that was decades ago, within 60 days of the SIP's approval.  Accordingly, to the extent Plaintiff's claims constitute a challenge to the SIP itself, they must be dismissed.

### <u>CONCLUSION & REQUEST FOR ORAL ARGUMENT</u>

For the foregoing reasons, the Court should dismiss Plaintiff WildEarth Guardians' claims against the Operators with prejudice for failure to state a claim, or in the alternative, abstain from adjudicating Plaintiff's claims and dismiss them under *Burford* abstention, the doctrine of primary jurisdiction, or the failure to timely challenge EPA's approval of the relevant SIP provisions.  The Operators request oral argument on this motion.

Respectfully submitted July 31, 2019,

s/ Shannon Stevenson
Shannon Wells Stevenson
Radcliffe Dann IV
James R. Henderson
Shalyn R. Kettering
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Shannon.Stevenson@dgslaw.com
Randy.Dann@dgslaw.com
Jim.Henderson@dgslaw.com
Shalyn.Kettering@dgslaw.com

Attorneys for Defendants Bonanza Creek
Energy Operating Company, LLC, Great
Western Operating Company, LLC, and
PDC Energy, Inc.

s/ Colin C. Deihl
Colin C. Deihl
Ghislaine G. Torres Bruner
Bennett Cohen
POLSINELLI PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
cdeihl@polsinelli.com
gbruner@polsinelli.com
bcohen@polsinelli.com

Attorneys for Defendants Extraction Oil and
Gas, Inc., Crestone Peak Resources
Operating, LLC, and Mallard Exploration,
LLC

s/ Eric P. Waeckerlin
Christopher A. Chrisman
Eric P. Waeckerlin
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, CO  80201-8749
cachrisman@hollandhart.com
epwaeckerlin@hollandhart.com

Attorneys for Defendant Noble Energy, Inc

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of July 2019, true and correct copies of the foregoing were served via the Court's CM/ECF System on the following.


Randall M. Weiner
Annmarie Cording
Law Offices of Randall M. Weiner, P.C.
3100 Arapahoe Avenue, Suite 202
Boulder, Colorado 80303
randall@randallweiner.com
annmarie@randallweiner.com

Katherine L. T. Merlin
Colorado Environmental Advocates
3100 Arapahoe Avenue, Suite 410
Boulder, Colorado 80303
kate@katemerlinlaw.com

*Attorneys for WildEarth Guardians*


<u>*s/ James R. Henderson*</u>
James R. Henderson