IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-01286-RBJ

WILDEARTH GUARDIANS,

      Plaintiff,

v.

EXTRACTION OIL & GAS, INC.,
BONANZA CREEK ENERGY OPERATING COMPANY, LLC,
CRESTONE PEAK RESOURCES OPERATING, LLC,
GREAT WESTERN OPERATING COMPANY, LLC,
MALLARD EXPLORATION, LLC,
NOBLE ENERGY, INC., and
PDC ENERGY, INC.,

      Defendants.

---

### ORDER ON DEFENDANTS' MOTIONS TO DISMISS

---

      This matter is before the Court on defendants Extraction Oil and Gas, Inc. ("Extraction");

Bonanza Creek Energy Operating Company, LLC ("Bonanza"); Crestone Peak Resources

Operating, LLC ("Crestone"); Great Western Operating Company, LLC ("Great Western"),

Mallard Exploration, LLC ("Mallard"); Noble Energy, Inc. ("Noble"); and PDC Energy, Inc.

("PDC")'s joint motion to dismiss, ECF No. 29, as well as Great Western's motion to dismiss,

ECF No. 30.  For the reasons stated herein, both motions are DENIED.

## I.  BACKGROUND

      Plaintiff WildEarth Guardians seeks civil penalties against seven operators of oil and gas

facilities for the emission of pollutants in violation of both the Clean Air Act ("CAA") and

Colorado's state implementation plan ("SIP") pursuant to the CAA.  ECF No. 1 at 50–53.

WildEarth's allegations are premised on its novel interpretation of Colorado's SIP and, alternatively, on the lack of available data to confirm defendants' facilities' pollutant emission levels prior to their receipt of synthetic minor permits.

## Regulatory Framework

The CAA establishes a cooperative-federalism framework to prevent and control air pollution. *See* 42 U.S.C. § 7407(a) (2018). The CAA directs the United States Environmental Protection Agency ("EPA") to set health-based standards for air emissions. *See id.* §§ 7407, 7409. States are responsible for achieving and maintaining compliance with these standards through a SIP. *See id.* § 7407(a)(1). The EPA reviews proposed SIPs after a notice and comment period to ensure compliance with applicable CAA requirements. *See id.* §§ 7410(a)(1)–(2), (k)(3); *Union Elec. Co. v. EPA,* 427 U.S. 246, 265 (1976). If the EPA approves the SIP, the SIP becomes federal law and is enforceable in federal court. *See General Motors v. United States*, 496 U.S. 530, 533–34 (1990).

The EPA has designated the Denver Metro-North Front Range as an "ozone nonattainment area," a region that violates federally established national ambient air quality standards for ground-level ozone.[1] *See* 40 C.F.R. § 81.306 (2020). Within nonattainment areas, major stationary sources must comply with federal nonattainment air provisions. *See* 42 U.S.C. §§ 7501–7515 (2018). To this end, the CAA requires that a SIP include a nonattainment plan that includes a process for "permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area." *See id.* § 7502.

The EPA has approved the portions of Colorado's SIP relevant to WildEarth's claims. ECF No. 1 ¶ 4. The Colorado Department of Public Health and Environment administers

---

[1] The region was deemed a "moderate" nonattainment area in 2008. *See* ECF No. 1 ¶ 35. In 2019 the EPA reclassified the region as a "serious" nonattainment area. *See* 40 C.F.R. § 52.321 (2020).

Colorado's SIP through two sub-departments: the Air Quality Control Commission ("Commission") and the Air Pollution Control Division ("Division").  *See* Colo. Rev. Stat. § 25-7-105.  The Commission develops rules and regulations regarding the construction, operation, and permitting of stationary sources of air pollutants, and the Division implements these rules and regulations.  *See id.*

Regulation 3 of Colorado's SIP governs the permitting of stationary sources of air pollutants, including for oil and gas facilities.  *See* 5 Colo. Code Regs. 1001-5 ("Regulation 3").  Under Regulation 3 a facility operator must provide Colorado notice of a new source of air pollutants by filing an Air Pollutant Emission Notice ("APEN").  *See id.*, Part A § II.B.3.  APENs provide information to determine what type of permit is required.  *See id.*  Each APEN identifies the facility's emissions points and provides emissions data for each point.  *See id.*

In conjunction with filing the APEN, an operator of a new facility must also apply for a construction permit.  The applicable permitting requirements for a given facility depend on whether the facility is a "major source" or a "minor source" of air pollutants.  *Compare* Regulation 3, Parts A–B *with* Regulation 3, Part D.  Whether a facility is a major source depends on its emissions levels.  Relevant in this case, a facility can be considered a major source based on emissions of either volatile organic compounds ("VOCs") or hazardous air pollutants ("HAPs").

A major source is "any stationary source of air pollutants that emits, or has the potential to emit, 100 tons per year or more of any regulated pollutant [e.g. VOCs]."  Regulation 3, Part D § II.A.25.b; 42 U.S.C. § 7479(1) (defining a "major emitting facility" as including "petroleum refineries" "which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant").  Under the CAA, a source is also considered major if it emits or has the potential

to emit 10 tons per year or more of any individual listed HAP or 25 tons per year of an aggregation of HAPs. *See* 42 U.S.C. § 7412(a)(1)–(2) (2018). A minor source is "any stationary source that does not qualify as a major source." Regulation 3, § I.B.26.

Thus, the definition of major source considers both actual emissions and potential emissions. A facility's "potential to emit" ("PTE") is defined as "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design." *Id.*, Part A § I.B.37; 40 C.F.R. §§ 51.166(b)(4) & 52.21(b)(4). A facility's PTE can be lowered by any physical or regulatory control that reduces its pollutants, so long as that control is "state enforceable and federally enforceable." *Id.*, Part A § I.B.37; 40 C.F.R. §§ 51.166(b)(4) & 52.21(b)(4). In the APEN, an operator must provide both "controlled" and "uncontrolled" PTE for each emission point. *See* Regulation 3, Part A § II.B.3. A facility's "controlled" PTE includes consideration of enforceable physical or regulatory controls. A facility's "uncontrolled" PTE is its raw PTE given no such controls.

Both the SIP and the CAA allow facilities to voluntarily lower emissions to avoid major-source requirements. *See* Regulation 3, Part B § II.A.7; Envtl Prot. Agency, Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act (1995) ("Options for Limiting PTE"), https://www.epa.gov/sites/production/files/documents/limit-pte-rpt.pdf. Specifically, a facility with uncontrolled PTE over major-source thresholds can be considered a minor source if its controlled PTE is below major-source thresholds. Such a facility is called a "synthetic minor source" and is not subject to major-source requirements. *See* Regulation 3, Part B § II.A.7.

Major sources for VOCs must comply with the CAA's preconstruction permitting program. 42 U.S.C. §§ 7475(a) & 7479(1)–(3) (2018). Pursuant to this federal requirement

Regulation 3 requires any proposed new or modified major source in a nonattainment area to obtain a nonattainment new source review permit ("NSR permit" or "major source permit") prior to construction. *See* Regulation 3, Part D. Among other things, an NSR permit requires operators of new or modified major sources to: (i) achieve "the lowest achievable emission rate," (ii) certify compliance at "all other existing major stationary sources owned, operated, or controlled by the applicant," (iii) achieve specific emission offset rates, (iv) include an analysis of alternative sites, sizes, processes, and environmental control techniques, and (v) demonstrate that emissions will not adversely impact visibility in CAA-designated areas. *See id.*, Part D, § V.A.7.

The CAA regulates requirements for HAPs. 42 U.S.C. § 7412 (2018). Major sources of HAPs must comply with the CAA's maximum achievable control technology ("MACT") requirements. *See id.* § 7412(g)(2)(B).

The SIP also provides a 90-day grace period for certain facilities applying for construction permits. Operators of certain oil and gas facilities need not file an application for a construction permit until "within thirty days after the report of first production is filed . . . but no later than ninety days following the first day of production." Regulation 3, Part B § II.D.7; *id.*, Part A, § II.D.1.lll. The parties dispute to which facilities this exception applies.

<u>Factual Background</u>

WildEarth is a nonprofit environmental advocacy and conservation organization based in Santa Fe, New Mexico. ECF No. 1 ¶ 12. WildEarth brings this suit against seven defendants who have constructed fifteen individual oil and gas production facilities within the Denver Metro-North Front Range nonattainment region. ECF No. 1 ¶¶ 2, 53, 57. The defendants include: Extraction, Bonanza, Crestone, Great Western, Mallard, Noble, and PDC. *Id.* ¶ 2. Each

of defendants' facilities release large amounts of air pollutants related to the production of oil and gas. *Id.* ¶ 30.

On February 20, 2019 WildEarth gave proper notice of its intent to sue for alleged violations of the SIP and the CAA, as required by § 304(b) of the CAA, 42 U.S.C. § 7604(b) (2018). ECF No. 1 § 5. Neither the EPA nor Colorado have commenced any civil action in any court regarding the alleged violations. *Id.*

On May 3, 2019 WildEarth filed its complaint in this Court against defendants. *Id.* It acknowledges that each defendant had already applied for synthetic minor permits for each of their facilities. *Id.* ¶¶ 60, 63, 66, 96, 99, 102, 105, 138, 171, 201, 234, 237, 240, 275, 278. However, WildEarth alleges that defendants have nevertheless failed to comply with both the SIP and the CAA. Specifically, WildEarth alleges that each of defendants' facilities had uncontrolled PTE above major-source thresholds for VOCs (i.e. above 100 tons per year) prior to receiving their synthetic minor permits. *Id.* ¶¶ 73, 113, 146, 178, 209, 248, 286. WildEarth also alleges that five of the defendants—Bonanza, Crestone, Mallard, Noble, and PDC ("HAP defendants")—had facilities with uncontrolled PTE above major-source thresholds for HAPs (i.e. either above 25 tons per year of aggregate HAPs or above 10 tons per year of any individual HAP). *Id.* ¶¶ 113, 146, 209, 248, 286.

WildEarth alleges three causes of action based on these facts. First, WildEarth alleges that all seven defendants began construction of their facilities without obtaining major source permits pursuant to the SIP and the CAA. *Id.* ¶¶ 307–09 (citing the SIP at Regulation 3, Part D; the CAA at 42 U.S.C. § 7503 (2018); and CAA regulations at 40 C.F.R. § 51.165). Second, WildEarth alleges that all seven defendants are operating in violation of major source operational requirements pursuant to the SIP and the CAA. *Id.* ¶¶ 310–14 (citing the SIP at Regulation 3,

Part D, § V.A.7.a; the CAA at 42 U.S.C. § 7503 (2018); and CAA regulations at 40 C.F.R. § 51.165).  Third, WildEarth alleges that the HAP defendants constructed and are operating in violation of MACT requirements pursuant to the CAA.  *Id.* ¶¶ 315–18 (citing the CAA at 42 U.S.C. § 7412(g)(2)(b) (2018) and CAA regulations at 40 C.F.R. §§ 63.5(b)(3)(i), 63.760–.777).

WildEarth seeks a declaratory judgment that defendants have violated the SIP and the CAA; an order that defendants cease production and operations at their facilities until obtaining NSR permits; an order that the HAP defendants cease production and operations at their facilities until they comply with applicable MACT requirements; civil penalties; and attorney's fees.  *Id.* at 52–53.

Before filing its complaint, WildEarth had publicly commented on pending permit applications for twenty-seven facilities, including seven of the fifteen facilities at issue in this case.  ECF No. 29-5 at 1.  Those public comments included arguments similar to the arguments in WildEarth's complaint.  The Division issued responses to WildEarth's comments on July 17, 2019, after WildEarth filed its complaint and before defendants filed their motions to dismiss.  *Id.* at 5.

In its responses, the Division rejected all of WildEarth's arguments.[2]  *Id.*  First, WildEarth argued that because the facilities were allegedly major sources at the time of construction, the Division did not have the authority to issue a minor source permit.  *Id.*  The Division disagreed.  It responded that the SIP "preclude[s] the [D]ivision from issuing a synthetic minor source permit if the source's *actual emissions* will be above major source thresholds," but that it does "not prohibit the [D]ivision from issuing such a permit based on

---

[2] I have reviewed each of the seven public responses and have found that they are substantially similar. ECF No. 29-5.  Therefore, for the sake of concision and clarity, I cite only to the Division's first response regarding Bonanza's Longhorn U-10 production facility.

allegations (even if correct) that the source's PTE was above these thresholds at the time it commenced construction." *Id.* (emphasis added). However, the Division acknowledged that "the fact that the [D]ivision is authorized to and issues a synthetic minor permit[] does not mean that the [D]ivision, EPA or a citizen could not bring an enforcement action against the source for constructing and operating without a[n] [NSR] Permit during the period prior to issuance of the synthetic minor permit." *Id.* at 6.

Second, WildEarth argued that because the facilities were allegedly major sources for VOCs, the facilities began construction and operation in violation of the NSR program. *Id.* In the Division's words, WildEarth argued that "Colorado's federally enforceable air quality program [does not] contain[] sufficient limitations on [PTE] for purposes of determining" whether major source requirements apply. *Id.* The Division disagreed. *Id.* Although the Division acknowledged that the facilities did not have federally enforceable permits when construction and operation began, it noted that "obtaining a pre-construction permit is only one of several mechanisms a company may use to limit [PTE] and avoid major source permitting requirements." *Id.* It found that the facilities at issue "controlled both actual emissions and PTE below major source thresholds upon the first day of production" by complying with "Colorado's extensive, and EPA-approved, regulatory program imposing control requirements and other emission limitations [that] itself serves as a legally, practically, and federally enforceable limit, and thus is appropriately considered in the calculation of PTE." *Id.* at 6–7.

Third, WildEarth argued that the facilities were also major sources for HAPs, and thus began construction and operation in violation of MACT requirements. *Id.* at 4. The Division disagreed, clarifying that the same logic that applied to VOCs also applied to HAPs. *Id.* at 7.

Finally, the Division reviewed actual emissions data and confirmed that actual emission

for each facility was below major-source thresholds for both VOCs and HAPs. *Id.*

Defendants filed a joint motion to dismiss on July 31, 2019. ECF No. 29. Defendants first argue that I should dismiss under Rule 12(b)(6) for failure to state a claim. *Id.* at 11. They assert that WildEarth has failed to plead a violation of either the SIP or the CAA because all three of its claims are based on the incorrect assumption that defendants' facilities are subject to major source requirements. *Id.* Second, defendants argue that I should dismiss under Rule 12(b)(1) based on abstention or the doctrine of primary jurisdiction because WildEarth's claims amount to a collateral attack on Colorado's implementation of its own complex regulatory scheme. *Id.* at 10–11.

Great Western also filed a separate motion to dismiss on July 31, 2019. ECF No. 30. It asserts that in addition to the reasons set forth in defendants' joint motion to dismiss, WildEarth's claims against Great Western should be dismissed for two additional, independent reasons based on facts specific to Great Western. *Id.* at 2. First, it argues that WildEarth lacks standing to sue Great Western because the Division issued a synthetic minor permit to Great Western prior to WildEarth's filing of its complaint. *Id.* Second, it argues that WildEarth's complaint fails to consider enforceable state-only controls in calculating its facility's PTE. *Id.*

I held oral argument on December 12, 2019. ECF No. 53. By the time of oral argument, the Division had granted synthetic minor source permits to all fifteen facilities at issue. *Id.* at 3:9–13.

## II.  STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A plausible claim is one that "allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While courts must accept well-pled allegations as true, purely conclusory statements are not

entitled to this presumption.  *Id.* at 678, 681.  Therefore, so long as the plaintiff pleads sufficient

factual allegations such that the right to relief crosses "the line from conceivable to plausible,"

she has met the threshold pleading standard.  *Twombly*, 550 U.S. at 556, 570.

Additionally, motions to dismiss based on standing, abstention, and primary jurisdiction

grounds may be decided under Fed. R. Civ. P. 12(b)(1).  *See, e.g.*, *Colo. Envtl. Coal. v. Wenker*,

353 F.3d 1221, 1227 (10th Cir. 2004); *Sierra Club v. Chesapeake Operating, LLC*, 248 F. Supp.

3d 1194, 1199 (W.D. Okla. 2012); *Kenney v. Helix TCS, Inc.*, 284 F. Supp. 3d 1186, 1188 (D.

Colo. 2018) ("Rule 12(b)(1) provides for challenges to a court's subject matter jurisdiction.").

Courts may consider public documents on a motion to dismiss without converting it into

a motion for summary judgment.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

322 (2007) (noting that courts may consider "matters of which a court may take judicial notice"

on a motion to dismiss); *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("[O]n a motion to

dismiss . . . we are not precluded in our review of the complaint from taking notice of items in

the public record.").

### III.  ANALYSIS

### A.  <u>Great Western's Motion to Dismiss re: Standing</u>

In its own motion to dismiss, Great Western argues that WildEarth has no standing to file

suit against it because it cannot establish redressability.  ECF No. 30 at 4.  Constitutional

standing constitutes three requirements: (1) injury in fact—a harm suffered by the plaintiff that is

"concrete" and "actual or imminent"; (2) causation—"a fairly traceable connection between the

plaintiff's injury and the complained-of conduct of the defendant"; and (3) redressability—"a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) and *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 45–46 (1976)) (internal citations omitted).

Redressability "encounters special problems in the context of citizen suits in which the only available relief is a penalty payable to the government." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1183 (10th Cir. 2012). The Supreme Court has explained that in requesting civil penalties, a plaintiff "seeks not remediation of its own injury . . . but vindication of the rule of law—the 'undifferentiated public interest' in faithful execution of [the law]." *Steel Co.*, 523 U.S. at 106 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 577 (1992)). Thus in *Steel Co.* the Supreme Court found that the citizen-suit plaintiff failed to establish redressability where the only requested relief was civil penalties and injunctive relief seeking access to various records of the defendant, the latter of which the court found would similarly do nothing to remedy the alleged past harm. *See id.* at 106, 108.

The Tenth Circuit has confirmed that citizen suits seeking civil penalties under the Clean Air Act encounter the same redressability problem. *See WildEarth Guardians*, 690 F.3d at 1183. Thus "[i]f the defendant's offending conduct has ceased" by the time the citizen suit is filed, the court will "dismiss for lack of redressability." *Id.* at 1185 (noting that if the offending conduct ceases *after* the suit is filed, the issue becomes instead one of mootness).

A plaintiff's interest in deterrence is not sufficient to overcome this redressability problem. *See id.* (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 185–86 (2000)). Civil penalties aimed at deterrence "cannot conceivably remedy any

past wrong" if the offending conduct has ceased by the time of suit.  *See Steel Co.*, 523 U.S. at 108.

Here, WildEarth's complaint seeks civil penalties for the alleged violations; declaratory judgment that Great Western has violated the SIP and the CAA; and injunctive relief ordering Great Western to cease production and operation at its facility until obtaining the proper permits. ECF No. 1 at 52–53.  Yet Great Western—uniquely among the defendants—obtained a synthetic minor permit before WildEarth filed suit.  ECF No. 30 at 4.  The Division approved Great Western's permit application for the Wilson facility on April 22, 2019.  *Id.* at 5.  WildEarth filed its complaint on May 13, 2019.  ECF No. 1.  Great Western thus argues that WildEarth lacks standing because the only remaining relief is civil penalties and declaratory relief, neither of which suffices to remedy a past wrong.  Great Western notes that WildEarth cannot rely on generalized deterrence to support a claim for civil penalties.

However, WildEarth argues that its claims against Great Western encompass a challenge to conduct that was still ongoing at the time of suit and remains ongoing to this day. Specifically, it argues that "Great Western's facilities *still* do not possess the major source permits that Plaintiff alleges are required."  *Id.* at 33–34.  Thus, WildEarth's complaint is premised not only on the theory that Great Western temporarily failed to possess *any* permit, but also on the theory that the Division's permit determination was improper such that Great Western is in continuing violation of the SIP and the CAA.

WildEarth does not expressly clarify why it believes the Division's permit determination was improper.  Elsewhere in its response WildEarth mentions that "once [defendants] qualified as major sources they are foreclosed from changing this designation without meeting Part D's [major-source] modification requirements."  *Id.* at 24.  Thus, to the extent that WildEarth alleges

a continuing violation with regard to Great Western, that violation appears to be premised on the theory that the Division did not have the authority to issue a synthetic minor permit to Great Western, because Great Western did not follow major-source modification requirements.

Regardless of the merits of this underlying argument, this alleged continuing violation sufficiently establishes redressability. Because this violation rests on the theory that Great Western still does not possess the proper permits, civil penalties and injunctive relief could remedy that violation. Accordingly, I find that WildEarth does have standing with regard to its claims against Great Western.

### B. *Burford* Abstention

In their joint motion to dismiss defendants argue that I should dismiss pursuant to the *Burford* abstention doctrine. ECF No. 29 at 17. The *Burford* abstention doctrine recognizes that federal courts may abstain to avoid interfering in complex state regulatory schemes. *See Burford v. Sun Oil Company*, 319 U.S. 315 (1943). In *Burford*, plaintiff Sun Oil brought a federal due process challenge to a Texas Railroad Commission order granting a drilling permit to defendant Burford. *See id.* at 316–17. The Court held that the federal district court should have abstained, noting the comprehensive nature of the state regulatory scheme, the large interest of the state in regulating and conserving its oil and gas resources, and the need for a unified approach to granting permits by a single adjudicatory body. *Id.* at 333–34.

In *New Orleans Public Service, Inc. v. Council of City of New Orleans* ("*NOPSI*"), the Supreme Court distilled the *Burford* doctrine as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state

efforts to establish a coherent policy with respect to a matter of substantial public concern.

491 U.S. 350, 361 (1989) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)); *W. Ins. Co. v. A & H Ins., Inc.*, 784 F.3d 725, 727 (10th Cir. 2015).[3]

The Supreme Court has emphasized that *Burford* abstention "represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it."  *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (internal quotation marks omitted).  Federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them."  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

The parties disagree both on the extent of state-court review available and on the extent to which this case implicates a complex state regulatory regime.

### 1.  Timely and Adequate State-Court Review

WildEarth argues that adequate state-court review is not available because the SIP does not include a citizen suit provision allowing citizens to seek relief for a company's failure to possess proper permits.  ECF No. 37 at 30.  Defendants respond that there is ample administrative and judicial review processes available to WildEarth at the state level.  ECF No. 42 at 11.  Colorado law allows "[a]ny participant in the public comment process and any other person who could obtain judicial review under applicable law" to appeal permit decisions in state

---

[3] Until 1988, the leading test for *Burford* abstention in the Tenth Circuit came from *Grimes v. Crown Life Insurance Company*, 857 F.2d 699, 704–05 (10th Cir. 1988).  Since 1988, however, the Supreme Court's ruling in *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 361 (1989), and *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996), have narrowed the test.  The Tenth Circuit has affirmed that these two cases now define the scope of abstention under *Burford*.  *See Oklahoma ex rel. Doak v. Acrisure Bus. Outsourcing Servs.*, LLC, 529 F. App'x 886, 897 (10th Cir. 2013) (unpublished) ("Since our decision in Grimes, the Supreme Court has narrowed application of the *Burford* abstention doctrine.").

court.  Colo. Rev. Stat. § 25-7-114.5(11).  WildEarth was provided notice and an opportunity to comment on draft permits issued by the Division and did comment on several of the draft permits at issue here.  ECF No. 42 at 10.

Yet WildEarth's complaint appears to be aimed not only at the Division's permit decisions, but also at defendants' pre-permit conduct.  The crux of WildEarth's argument is that defendants failed to comply with major-source requirements under both the SIP and the CAA prior to the Division's issuance of permits, even assuming that the Division's permit determination was correct.

It is unclear whether state-court review of the Division's permitting determinations would address this pre-permit conduct.  WildEarth argues that it does not.  ECF No. 37 at 30 ("[R]elief for a company's failure to possess a CAA permit is only available in a federal CAA citizen suit.").  Defendants proffer no direct response, instead only citing generally to the state permit decision and appeal process.  It is true that in the permitting process for at least some of the facilities, the Division determined that defendants did not violate major-source requirements by beginning construction and operation prior to obtaining their synthetic minor permits.  ECF No. 29-5 at 5.  But neither party confirms whether this determination, in contrast to the ultimate permitting decision, is appealable.

Nor does either party provide analogous case law.  Both parties cite to case law that involves only a direct challenge to the state's permit decision.  *See, e.g.*, *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 698 F. Supp. 2d 1259, 1260 (D. Colo. 2010) (abstaining in CAA citizen suit challenge where "Colorado has a comprehensive review process [for permits] that allows all issues to be properly addressed and reviewed"); *Voigt v. Coyote Creek Mining Co., LLC*, No. 1:15-CV-00109, 2016 WL 3920045, at *13–14 (D.N.D. July 15, 2016) (refusing to abstain in a

CAA citizen suit challenge where plaintiff did not personally have to access to direct state-court review because it had not participated in the public comment period, and because there was an insufficient administrative record).  *Id.*

Because it is not clear that the state-court judicial review process would address defendants' alleged pre-permit violations, I cannot find at this stage that WildEarth has the ability to seek timely and adequate state-court review.  This alone is fatal to *Burford* abstention. However, in the interest of finality I also address the parties' disagreement regarding the extent to which this case implicates a complex state regulatory regime.

### 2.   Complex State Regulatory Regime

The parties also disagree on the extent to which this case implicates either (1) "difficult questions of state law bearing on policy problems of substantial public import" or (2) questions of state law the resolution of which "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *NOPSI*, 491 U.S. at 361. Defendants argue that administering the SIP involves complex state policy issues best left to Colorado so as to avoid frustrating well-established, coherent state permitting programs.  ECF No. 29 at 18.

First, to the extent that this case involves questions of state law, most of that state law is simply a restatement of federal law.  *See Voigt*, 2016 WL 3920045, at *9 (refusing to abstain where "nominally some of the law that applies in this case are state regulations," but "these regulations, for the most part, simply restate the substance of provisions of the CAA or EPA's regulations").  This is true for Colorado's definition of "major source" for VOCs for oil and gas facilities.  *See* Regulation 3, Part D § II.A.25.b; 42 U.S.C. § 7479(1) (2018).  It is also true for

Colorado's definition of PTE, on which the SIP's synthetic minor source program relies. *See* Regulation 3, Part A § I.B.37; 40 C.F.R. §§ 51.166(b)(4) & 52.21(b)(4) (2020).

Colorado's pre-permit regulations are unique to the SIP. However, these regulations are only in dispute regarding whether they may be included in PTE calculations—a determination that is based on federal case law and EPA guidance, as discussed below. Colorado's 90-day exemption is also unique to the SIP, and, unlike the pre-permit regulations, does require interpretation of pure state law. However, I do not consider the 90-day exemption to be a particularly difficult policy issue given that, as discussed below, WildEarth and the Division appear to agree on its interpretation as applied here (i.e., as applied to sources with actual emissions above major-source thresholds). Thus, I do not find that this case presents difficult, unique questions of state law rendering this Court inexpert.

Second, defendants argue that federal resolution of this case would "disrupt state efforts to establish a coherent policy." *NOPSI*, 491 U.S. at 361. According to the Supreme Court, this prong of *Burford* abstention requires examining "(1) the strength of the federal interests that are furthered by providing a federal forum, (2) the degree to which the problem is truly local, and (3) whether there are substantial benefits accruing to the states by having their courts be the principal adjudicators, and then balancing the relative interests." *Voigt*, 2016 WL 3920045, at *10 (citing *NOPSI*, 491 U.S. at 360–64 and *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)).

The underlying issue in this case is whether defendants were subject to major-source requirements under both the SIP and the CAA. Ensuring that major sources follow major-source requirements is equally a federal issue as it is a Colorado issue. *See* 42 U.S.C. § 7401(b) (2018) (describing the purpose of the CAA as "to protect and enhance the quality of the Nation's air

resources so as to promote the public health and welfare and the productive capacity of its population"); *see also Voigt*, 2016 WL 3920045, at *11 (noting that "whether defendant's coal mine is a major source is obviously not purely a matter of state law" because "the federal interest in insuring that major sources are properly identified and classified . . . is the cornerstone of the [CAA's major-source] program").

"Arguably, Congress has already decided how this balance [between state and federal interests] should be struck." *Voigt*, 2016 WL 3920045, at *10. "The CAA allocates what are federal responsibilities and what are state responsibilities and then, against that backdrop, provides a federal cause of action in § 7604(a)(3) for when a major source begins construction without having first obtained a major source permit along with a *specific* grant of federal court jurisdiction." *Id.*; *see, e.g.*, *Citizens for Pennsylvania's Future v. Ultra Res., Inc.*, 898 F. Supp. 2d 741, 750 (M.D. Pa. 2012) ("[I]t would be improper to abstain from exercising jurisdiction when Congress has clearly established a cause of action for citizens suits."). The CAA also provides a federal cause of action in § 7604(a)(1) for any violation of "an emission standard or limitation," which includes "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(a)(1), (f)(1) & (4).

The Court of Appeals for the Fifth Circuit has underscored the importance of this congressional intent in the *Burford* abstention context. In *Sierra Club, Inc. v. Sandy Creek Energy Associate*, the Fifth Circuit refused to abstain in a citizen suit challenging a state agency's application of the CAA. *See Sierra Club, Inc. v. Sandy Creek Energy Associates, L.P.*, 627 F.3d 134, 144 (5th Cir. 2010). It noted: "Whereas *Burford* consisted of a federal constitutional challenge to a state-created agency action, the present challenge raises no federal constitutional concerns about any state-created regulatory body—but instead utilizes a federal

congressionally-created cause of action to challenge a particular entity's failure to comply with a federally created regulatory scheme." *Id.* (internal citations omitted) (citing *Burford*, 319 U.S. 315).

It is true that *Sandy Creek* involved a challenge to the state's application of the CAA, as opposed to both the state's application of the CAA and of its own SIP. *See id.* Yet I do not find this distinction determinative. Although the SIP itself is a state regulatory framework, it was created pursuant to the CAA—"a comprehensive national program that made the States and the Federal Government partners in the struggle against air pollution." *GM Corp. v. United States,* 496 U.S. 530, 532 (1990). The Fifth Circuit explained: "Congress designed this regulatory scheme to specifically grant federal courts subject matter jurisdiction over suits . . . . such as this one, where citizens challenge the construction of a 'modified major emitting facility' for which 'any requirement under section 7411 or 7412 of this title' has not been met." *Id.* at 144 n.15 (referring to the sections of the CAA providing MACT requirements). Abstaining under *Burford* here would undermine congressional intent by precluding federal oversight of a citizen's challenge to the construction and operation of a major source in violation of major-source requirements under the CAA.

Defendants proffer several examples of federal courts abstaining in challenges to state permitting determinations pursuant to the CAA. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 481 (6th Cir. 2004) (affirming abstention in citizen suit challenge under CAA to state agency's determination that one facility did not require a major source permit, and that two facilities were "not a single emitting source"); *Sugarloaf Citizens Ass'n v. Montgomery Cty., Md.*, 33 F.3d 52, 1994 WL 447442, at *4 (4th Cir. Aug. 17, 1994) (affirming abstention in citizen suit challenge under CAA to state agency's issuance of permit); *WildEarth Guardians v. Pub. Serv. Co. of*

*Colo.*, 698 F. Supp. 2d 1259, 1263 (D. Colo. 2010) (abstaining from "any further review of the permit in the future" in citizen suit challenge); *Nat. Res. Def. Council, Inc. v. BP Prod. N. Am., Inc.*, No. 2:08-CV-204 PS, 2009 WL 1854527, at *4 (N.D. Ind. June 26, 2009) (abstaining in citizen suit challenge under CAA to the state agency's issuance of a minor source permit rather than a major source permit).

Yet defendants' cited cases all involve a direct challenge to the state's ultimate permit decision.  In contrast, WildEarth's complaint here primarily targets defendants' pre-permit conduct.  It is true that federal review of defendants' pre-permit obligations could have implications for the Division's ultimate permit decision.  But WildEarth's argument appears to be focused on defendants' failure to follow major source requirements prior to, and regardless of, the state's ultimate permit issuances.

It is also true, as defendants assert, that federal review could potentially subject hundreds of other non-party oil and gas facilities to civil penalties.  ECF No. 42 at 12.  Yet WildEarth's complaint is premised on compliance with not only the SIP, but also the CAA.  If it is the case that hundreds of other non-party oil and gas facilities have been out of compliance with not only the SIP, but also the CAA, then those facilities should indeed have to pay civil penalties under the CAA.  The mere fact that federal review may have wide-ranging impact on state industry is not preclusive of such federal review where industry compliance with federal law is implicated.

Accordingly, I will not exercise my discretion to abstain under *Burford*.  It is not clear that WildEarth has access to timely and adequate state-court review, nor does this case implicate the same sort of complex state regulatory regime of which *Burford* is meant to preclude federal review.

### C. **Doctrine of Primary Jurisdiction**

In their joint motion to dismiss defendants argue that I should dismiss pursuant to the

doctrine of primary jurisdiction. ECF No. 29 at 22. Under the doctrine of primary jurisdiction,

federal courts may discretionarily refer an issue to an administrative agency with specialized

expertise. *See TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1238 (10th Cir. 2007); *Reiter v.*

*Cooper,* 507 U.S. 258, 268–69 (1993). The doctrine is "designed to allow an agency to pass on

issues within its particular area of expertise before returning jurisdiction to the federal district

court for final resolution of the case." *Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.,* 415

F.3d 1171, 1176, 1179 (10th Cir. 2005) ("The entire purpose of the primary jurisdiction doctrine

is to allow agencies to render opinions on issues underlying and related to the cause of action."

(citing *W. Pac. R.R. Co.,* 352 U.S. at 63–64)). "The district court may retain jurisdiction over the

proceedings by staying the plaintiff's claims pending agency action or, if neither party will be

unfairly disadvantaged, dismissing the case without prejudice." *TON Servs.*, 493 F.3d at 1239

(citing *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)).

The Tenth Circuit has held that a court considering whether to invoke the doctrine of

primary jurisdiction must "consider whether the issues of fact in the case: (1) are not within the

conventional experience of judges; (2) require the exercise of administrative discretion; or (3)

require uniformity and consistency in the regulation of the business entrusted to the particular

agency." *Crystal Clear Commc'ns,* 415 F.3d at 1179. However, there is no "fixed formula . . .

for applying the doctrine." *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 64 (1956).

I will not discretionarily invoke the doctrine of primary jurisdiction for many of the same

underlying reasons I do not abstain under *Burford*. First, although I acknowledge the Division's

expertise in reviewing and issuing permits in compliance with the SIP and the CAA, that

expertise is not outside the conventional experience of judges.  The CAA specifically provides federal jurisdiction over failure to obtain major source permits.  *See* 42 U.S.C. § 7604 (2018).  Defendants argue that calculating PTE for a given facility is outside this Court's expertise.  ECF No. 42 at 13.  Yet the disagreement over PTE calculations here is premised on the definition of "federally enforceable," which is based on federal case law and EPA guidance.  The interpretation and application of federal law is within the conventional experience of judges.

Second, this case does not require the exercise of administrative discretion.  This case does not, for example, rely on considerations of state public policy.  *Cf. Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996) ("[W]hile the court is ultimately the appropriate body to declare a tariff practice void as against public policy, it should nonetheless refer the initial determination to the regulatory agency where it may benefit from the agency's expertise and insight, and to ensure uniformity." (internal citation omitted) (citing *Sw. Sugar & Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 420 (1959)).  Defendants make no argument to the contrary.

Third, although the Division ensures uniformity and consistency in the regulation of oil and gas permits, this interest does not weigh heavily enough to merit invocation of the doctrine.  Again, Congress has already expressly indicated its intent for federal oversight of the CAA by provision of federal jurisdiction and citizen-suit jurisdiction.  *See, e.g., Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc. ("Tri-State"),* 173 F.R.D. 275, 284 (D. Colo. 1997) ("[A]pplying the doctrine of primary jurisdiction to citizen suits would frustrate Congress's intent, as evidenced by its provisions for citizen suits, to facilitate broad enforcement of environmental-protections laws and regulations.").  This case involves oversight of both the SIP and the CAA.

Accordingly, I will not invoke the doctrine of primary jurisdiction to either dismiss WildEarth's complaint or to refer any issues to a state agency.

### D.  Whether the Facilities Were Major Sources

In their joint motion to dismiss defendants argue that WildEarth's entire complaint is premised on the incorrect conclusion that defendants' facilities were major sources.  ECF No. 29 at 11.  Indeed, I find that all three of WildEarth's causes of action are premised on the theory that defendants' facilities were major sources at least until issuance of synthetic minor permits.[4] WildEarth alleges that both the actual emissions and PTE for defendants' facilities were above major-source thresholds prior to issuance of their synthetic minor permits.  WildEarth's three causes of action subsequently trace the ways that defendants have allegedly violated major-source requirements, including failing to obtain major-source preconstruction permits and failing to comply with major-source operational requirements.

Although the parties present legal disagreements regarding the three individual causes of action, each disagreement ultimately traces back to WildEarth's assertion that defendants' facilities were major sources.  Therefore, before analyzing the individual causes of action, I analyze whether WildEarth has sufficiently alleged that defendants' facilities were major sources.  I first consider WildEarth's allegation that defendants' facilities' PTEs were above

---

[4] Circumstances changed following WildEarth's filing of its complaint.  WildEarth filed its complaint after each defendant had applied for synthetic minor permits but before the Division had issued any of those permits to any defendant except Great Western.  During the course of this litigation, the Division issued synthetic minor permits to all remaining defendants for all relevant facilities.  WildEarth has not expressly clarified how this permit issuance affects its claims (except with regard to Great Western, discussed above in the context of standing).  However, WildEarth notes in its response: "The only issue for this Court to decide . . . is whether Defendants are liable for failing to possess their Part D permits only up to the time they obtain synthetic minor permits, or indefinitely because once they qualified as major sources they are foreclosed from changing this designation without meeting Part D's modification requirements."  ECF No. 37 at 24.  Accordingly, I do not interpret WildEarth's complaint as alleging that the Division was incorrect in granting synthetic minor permits, except to the extent that it did not have the procedural authority to do so once the facilities were considered major.  In other words, I do not interpret WildEarth's complaint as attacking the substance of the synthetic minor permits themselves.

major-source thresholds prior to issuance of their synthetic minor permits.  I next consider

WildEarth's allegation that defendants' facilities actual emissions were above major-source

thresholds prior to issuance of their synthetic minor permits.

      1.   <u>Potential to Emit</u>.

WildEarth alleges that defendants' facilities all had PTE above major-source thresholds,

at least until issuance of their synthetic minor permits.  This theory is premised on WildEarth's

legal interpretation of the SIP, and more specifically of both the SIP's and the CAA's definition

of PTE.

WildEarth's argument is as follows.  The controls in a synthetic minor permit can lower

PTE—indeed, that is the express purpose of a synthetic minor permit.  However, these controls

cannot lower PTE until *after* the permit is issued.  This is because a control may only lower PTE

if it is "federally enforceable."  Regulation 3, Part A, § I.B.37; 40 C.F.R. §§ 51.166(b)(4) &

52.21(b)(4).  A synthetic minor permit is not "enforceable" until issuance, and so the controls

within that permit are also not "enforceable" until issuance.  ECF No. 37 at 23.  Thus, there were

no enforceable controls limiting defendants' facilities' PTE prior to permit issuance.  As such,

uncontrolled PTE determines whether a source is major prior to permit issuance.  Because the

parties do not dispute that the uncontrolled PTE for defendants' facilities exceeded major-source

thresholds prior to issuance of their synthetic minor permits, the facilities were major sources.

ECF No. 37 at 22.

Defendants dispute WildEarth's interpretation of the SIP.  Instead they argue that the

controls in a synthetic minor permit do lower PTE prior to issuance, and that the relevant PTE

for determining whether a source is major is controlled PTE, not uncontrolled PTE.  ECF No. 29

at 13.  First, in their joint motion to dismiss, defendants assert that the purpose and plain

language of the SIP precludes operators from having to comply with major-source requirements
if they are applying for synthetic minor permits.  ECF No. 29 at 12.  Second, they argue that the
Division has already considered and rejected WildEarth's interpretation, and that that state
agency's interpretation must be given deference.  *Id.* at 15.  Third, Great Western argues in its
own separate motion to dismiss that even if WildEarth is correct that a synthetic minor permit
cannot lower PTE until issuance, WildEarth still improperly excludes other PTE-limiting state
regulations.  ECF No. 30 at 11.

a.  <u>Purpose and Plain Language of the SIP</u>.

Defendants argue that the purpose and plain language of the SIP precludes operators from
having to comply with major-source requirements if they are applying for synthetic minor
permits.  ECF No. 29 at 12.

EPA guidance expressly provides that operators may voluntarily limit their PTE so as to
avoid major-source requirements.  S*ee, e.g.*, Envtl. Prot. Agency, Fact Sheet: New Source
Review, https://www.epa.gov/sites/production/files/2015-
12/documents/nsrbasicsfactsheet103106.pdf (noting that operators may "voluntarily accept
enforceable limits to keep their emissions below the major source thresholds and avoid the major
NSR requirements"); Envtl. Prot. Agency, *Options for Limiting PTE* at 1 ("[I]n situations where
unrestricted operation of a source would result in a potential to emit above major-source levels,
such sources may legally avoid program requirements by taking federally-enforceable permit
conditions which limit emissions to levels below the applicable major source threshold.").
However, neither EPA guidance nor the CAA dictate exactly how to implement such programs.

The SIP's synthetic minor source program is Colorado's implementation of the EPA's
general concept.  The express purpose of the SIP's synthetic minor program is to allow operators

to voluntarily reduce their PTE so as to avoid major-source requirements.  *See* Regulation 3,

Statement of Basis, Specific Statutory Authority and Purpose, Revisions to Reg. No. 3 at 240

(July 15, 1993) ("Some existing sources may want to obtain federally enforceable limits . . . in

order to avoid the [major-source] operating permit requirements . . . ."); ECF No. 42 at 5.

However, the SIP does not expressly clarify whether a synthetic minor source permit can

lower PTE prior to issuance.  Nor does it include any express language requiring operators to

comply with major-source requirements until issuance of a synthetic minor permit.  *Id*.  Rather,

WildEarth's interpretation relies on an inter-stitched web of provisions and definitions.  Though

this itself is certainly not determinative, defendants insinuate that it is unlikely that such a

significant and burdensome requirement would be hidden in such a web.

Based on the SIP's underlying purpose and the lack of express language supporting

WildEarth's interpretation, defendants argue that WildEarth's interpretation "would lead to

absurd results."  ECF No. 42 at 5.  It contravenes the synthetic minor program's express purpose

of avoiding major-source requirements.  It would require operators to simultaneously comply

with two different permitting program tracks—both major source and synthetic minor source.  It

would require operators to "go through the extensive, often years-long, major-source permitting

process and comply with onerous major-source operational requirements until the synthetic

minor permit is issued"—which is exactly what the SIP expressly states is avoided through the

synthetic minor source program.  *Id.* at 6.  WildEarth's interpretation would reduce incentive for

operators to participate in the synthetic minor source program at all, thereby reducing their

incentive to voluntarily limit their emissions.  ECF No. 29 at 14.

WildEarth responds that its interpretation does not require literal "simultaneous"

compliance because major-source compliance would end upon receipt of the synthetic minor

permit.  ECF No. 37 at 2.  Yet this underestimates the burden of such compliance.  For one,

operators would still have to comply with two different permitting program tracks, even if those

requirements were not literally simultaneous in time.  For another, the synthetic minor permit

program *does* require compliance before issuance, so there would be overlap.  *See* Regulation 3,

Part B, § II.D.7 ("The application [for a synthetic minor construction permit] shall include a list

of all applicable requirements, and how the requirements will be met until a construction permit

is issued.").

WildEarth also points to language in the SIP that allegedly acknowledges that a source

can be subject to both synthetic minor source permitting requirements under Part B and major-

source permitting requirements under Part D.  Part A of Regulation 3 provides: "Sources of air

pollutants that are subject *only* to the Part B Construction Permit Program may voluntarily apply

for an Operating Permit pursuant to Part C."  *See* Regulation No. 3, Part A, § I.A (emphasis

added).  The use of the word "only," argues WildEarth, indicates that sources may be subject to

multiple permitting track requirements.  ECF No. 37 at 21.

This interpretation of Part A fails to consider the statute as a whole.  Part C of Regulation

3 provides that major sources must obtain an operating permit, and that minor sources may

voluntarily choose to obtain an operating permit.  *See* Regulation 3, Part C, § I; Regulation 3,

Part C, § II.A.1.b, d (specifying major sources and "[a]ny source required to have a permit

pursuant to . . . Part D" as sources that are required to obtain operating permits).  Thus, the

language in Part A referring to sources that are "subject *only* to the Part B Construction Permit

Program" is a reference to those minor sources that are only required to obtain a construction

permit under Part B, but may also voluntarily choose to obtain an operating permit under Part C.

As such, WildEarth is incorrect that the SIP contains language implying that a source can be subject to both major-source and synthetic minor source permitting requirements.  Part A does not indicate that a source may be subject to requirements under multiple categories of *sources*, i.e. synthetic minor source and major source.  Rather, Part A acknowledges that a source may be subject to requirements under multiple categories of *permits*, i.e. construction permits and operating permits.

WildEarth also cites the Second Circuit's decision in *Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532 (2d Cir. 2004), to support its interpretation that a source may be subject to both major-source and synthetic minor source permitting requirements.  ECF No. 37 at 21.  In *Weiler* the plaintiffs argued that the New York state agency incorrectly approved the defendant's factory as a synthetic minor source under New York's SIP.  *Id.* at 535.  Plaintiffs alleged that the factory was instead a major source because the controls in the synthetic minor permit were not enforceable.  *Id.*  The district judge below held that the plaintiffs failed to state a claim because the CAA does not allow citizen suits challenging the state agency's determination that no major source permit is necessary.  *Id.* at 536.  The Second Circuit reversed, holding that the CAA does allow citizen suits challenging a state agency's determination that no major source permit is necessary.  *Id.* at 539 (relying on "[t]he plain text of the [CAA], together with an understanding of the central role played by citizen suit provisions in enforcing the [CAA] and the EPA's own interpretation").

Thus, *Weiler* stands for the proposition that a federal court has jurisdiction to hear citizen-suit challenges to a state agency's permit determination.  Here, consistent with *Weiler*, defendants do not argue that this Court lacks citizen suit jurisdiction over WildEarth's claims.[5]

---

[5] Defendants elsewhere argue that I should abstain, but not that I lack subject-matter jurisdiction.

Rather, defendants argue that WildEarth's claims have no legal merit.  Contrary to WildEarth's assertions *Weiler* says nothing about whether WildEarth's interpretation of the SIP is legally correct.[6]

Defendants make a compelling argument regarding the synthetic minor program's underlying purpose of avoiding major-source requirements and the EPA's blessing of such purpose.

b.   <u>State Agency Interpretation</u>.

Defendants argue that the Division has already rejected WildEarth's interpretation of the SIP, and that this rejection must be given deference as a state agency interpretation.  ECF No. 29 at 15.  WildEarth does not address the issue of deference to the Division's interpretation, instead focusing on the underlying disagreement.  Although federal courts' deference to state agencies is an unsettled area of law, the framework for deference to agencies is useful for analyzing the Division's interpretation.

Regarding deference to federal agencies, the Supreme Court has consistently held that "considerable respect is due 'the interpretation given [a] statute by the officers or agency charged with its administration.'"  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980) (quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)).  "An agency's construction of its own regulations has been regarded as especially due that respect."  *Id.*  This deference extends

---

[6] WildEarth emphasizes the following language in *Weiler v. Chatham Forest Products, Inc.*: "[W]e cannot say that the existence of potentially overlapping enforcement mechanisms demonstrates Congress' intention to preclude a citizen suit in this particular case."  392 F.3d 532, 538 (2d Cir. 2004).  WildEarth appears to interpret "overlapping enforcement mechanisms" as referring to overlapping regulatory requirements.  As such, WildEarth interprets this language as confirming that a source may be subject to permitting requirements under multiple source categories.  This is an incorrect interpretation of this phrase.  "Overlapping enforcement mechanisms" refers not to regulatory requirements but to methods of judicial or administrative enforcement, such as an administrative proceeding in the state court, an EPA action, or a CAA citizen suit under § 7604(a)(1) or § 304(a)(3).  *Id.* at 537.

to an agency's application of its regulations to a specific set of facts.  *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council,* 557 U.S. 261, 283 (2009) ("[W]e do find that agency interpretation and agency application of the regulations are instructive and to the point.").

It is unsettled whether a state agency is entitled to the same deference when administering federal law or when administering state law pursuant to federal delegation.  The Tenth Circuit has held that a "state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency."  *AMISUB (PSL), Inc. v. Colo. Dep't of Soc. Servs.*, 879 F.2d 789, 796 (10th Cir. 1989) (reviewing de novo the state of Colorado's Medicaid plan for consistency with the federal Medicaid Act and relevant federal regulations) (citing *Turner v. Perales*, 869 F.2d 140, 141–42 (2d Cir. 1989)); *see also Houghton ex rel. Houghton v. Reinertson*, 382 F.3d 1162, 1168 (10th Cir. 2004) (reviewing de novo the state of Colorado's new Medicaid rule for consistency with the Medicaid Catastrophic Care Act and the federal Medicaid Act).

But "the Tenth Circuit's conclusion does not preclude all deference to state agencies." *Grand Canyon Tr. v. Energy Fuels Res. (U.S.A.) Inc.*, 269 F. Supp. 3d 1173, 1195 (D. Utah 2017).  Indeed, "other circuits have concluded that state agencies' regulatory decisions may, nonetheless, merit some deference where the agency is administering federal statutes and regulations upon an express delegation from Congress as long as the agency's interpretation or application is otherwise consistent with federal law."  *See id.* (collecting circuit cases).  After all, "the state agency has at least some expertise and Congress likely intended to draw on that expertise when permitting delegation to a state agency."  *See id.* (collecting cases).

The Supreme Court's view of the EPA's role in overseeing state agencies' administration of the CAA also supports some deference by this Court to state agencies.  In *Alaska Department*

*of Environmental Conservation v. EPA*, 540 U.S. 461, 490–91 (2004), the Supreme Court instructed "that the EPA should not 'step in' and involve itself in state administration of the CAA unless the 'state agency's' application of the relevant standard is 'not based on a reasoned analysis.'" *Grand Canyon Tr.*, 269 F. Supp. 3d at 1196 (quoting *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 490).

In *Grand Canyon Trust v. Energy Fuels Resources (U.S.A.) Inc.* a Utah district court engaged in analysis analogous to the case at hand. *See* 269 F. Supp. 3d at 1195. The court relied partially on *Alaska Department of Environmental Conservation* to grant some deference to the Utah state agency responsible for administering the CAA. *See id.* The agency had determined that a uranium mill had not violated federal environmental regulations promulgated pursuant to the CAA. *See id.* at 1184. The court concluded that the agency was "entitled to some deference because it is applying federal regulations pursuant to Congress's express authorization in a manner that is not inconsistent with federal law and is reasonable." *Id.* at 1196. Specifically, the court took into account the fact that the agency had administered the regulations for over twenty years; that the agency's interpretation was not contradictory to the CAA or to prior EPA interpretations, especially given the CAA's silence on relevant matters; that the agency's interpretation was reasonable as a practical matter; and that conclusions of other regulating federal agencies also supported the agency's approach. *Id.* at 1196–98.

Of course, *Grand Canyon Trust* dealt with a state agency directly administering the CAA, whereas here the Division's interpretation is an interpretation of the Colorado SIP. Yet I find the court's analysis of Tenth Circuit and Supreme Court precedent to be persuasive here given that Colorado's SIP is enacted pursuant to express federal delegation. With the understanding that

this is a highly unsettled area of law, I will take guidance from the factors considered in *Grand Canyon Trust* in determining whether and to what extent to defer to the state agency.

Here, defendants argue that the Division has expressly rejected WildEarth's interpretation of the SIP. ECF No. 29 at 15. Defendants point to the Division's responses to WildEarth's public comments on some of defendants' permit applications. ECF No. 29-5 at 4 ("The [D]ivision disagrees with each of the arguments posed by WildEarth Guardians."). In those responses, the Division determined that the relevant facilities had not violated major-source requirements by beginning construction and operation before obtaining synthetic minor permits. *Id.* at 6–7.

Specifically, the Division noted that "obtaining a pre-construction permit is only one of several mechanisms a company may use to limit [PTE] and avoid major source permitting requirements." *Id.* It determined that "Colorado's extensive, and EPA-approved, regulatory program imposing control requirements and other emission limitations itself serves as a legally, practically, and federally enforceable limit, and thus is appropriately considered in the calculation of PTE." *Id.* at 6–7. It emphasized that the program "ensure[s] that new oil and gas exploration and production facilities either keep emissions below major source thresholds, or obtain appropriate [NSR] permits prior to commencing construction and operation." *Id.* at 7.

As examples of enforceable controls on PTE, the Division cited to Regulation 3 and to Regulation 7, §§ XII, XVII. *Id.* at 6. The Division did not provide specific examples within Regulation 7 but did cite specific examples within Regulation 3.[7] Regulation 3, Part B, § II.D.7

---

[7] Defendants expand upon the Division's logic by providing additional information about Regulation 7. ECF No. 42-4 at 3–4. Noting that "there are numerous state-law regulations that limit emissions from day one of production, regardless of whether a construction permit has been issued," defendants provide a list of such examples within Regulation 7. *Id.* Great Western also provides specific data on how some of these regulations lowered its own PTE prior to issuance. ECF No. 30 at 10. For example, uncontrolled emissions for Great Western's condensate tanks at the Wilson facility are 249.12 tons per year, but

requires operators to maintain records to document compliance with control requirements and track emissions. ECF No. 29-5 at 6; *see also* Regulation 3, Part B, § II.D.7 ("The application [for a construction permit] shall include a list of all applicable requirements, and how the requirements will be met until a construction permit is issued."). Those records "form the basis of the source's permit application, through which the [D]ivision verifies that emissions are and will continue be below major source thresholds." ECF No. 29-5 at 6. Additionally, Regulation 3, Part B, § II.D prohibits operators from improperly using the 90-day exemption as a loophole to avoid major-source requirements while applying for a synthetic minor permit. *Id.* ("[O]perators of sources whose *actual emissions* will be above major source thresholds may not avoid the requirements of the nonattainment new source review program by availing themselves of the ability to delay application submittal until after construction and operation." (emphasis added)).

Thus the Division's interpretation relies on the SIP as a whole to ensure that operators either keep their facilities below major-source thresholds or comply with major-source requirements. It particularly relies on the SIP's requirement that operators must comply with the controls listed in their synthetic minor permit application from the first day of production.

I use the factors from *Grand Canyon Trust* to consider whether to afford some deference to the Division's interpretation. *See* 269 F. Supp. 3d at 1195. To reiterate, the district court in *Grand Canyon Trust* took into consideration the fact that the agency had been administering the regulations for over twenty years; that the agency's interpretation was not contradictory to federal law; that the agency's interpretation was reasonable; and that conclusions of other regulating agencies also supported the agency's interpretation. *See id.* at 1196–98.

---

Regulation 7, § XII.D.1 requires a 95% destruction efficiency for storage tanks, thus reducing controlled PTE for condensate tanks to 12.46 tons per year. *Id.*

Here, the Division has been administering its SIP for decades.  Even more compellingly, the Division has been interpreting and enforcing this particular issue consistently for decades. ECF No. 29 at 16.  Based on my above discussion of the express purpose of the synthetic minor permit program, I also find that the Division's interpretation is reasonable as a practical matter. The parties proffer no arguments or allegations regarding similar conclusions by other regulating agencies.

Most significantly, the Division's interpretation is not contradictory to federal law. Indeed, the Division's interpretation is supported by federal law.  WildEarth's argument is premised on the theory that uncontrolled PTE is used to determine whether a source is major because the SIP does not include any *enforceable* pre-permit controls.  The SIP does contain pre-permit controls, but WildEarth argues that those controls are not enforceable because they are not federally enforceable.  ECF No. 53 at 28:14–29:8.  The SIP's definition of PTE requires controls to be both "state enforceable and federally enforceable."[8]  Regulation 3, Part A § I.B.37. Regulation 7, however, includes express language that certain controls are "state-only."  ECF No. 53 at 46:5–12.  Regulation 3 does not contain this "state-only" language, and WildEarth does not address whether the pre-permit controls therein are federally enforceable.

But federal case law and EPA guidance negates WildEarth's argument on enforceability. In *National Mining Association v. EPA*, 59 F.3d 1351, 1364 (D.C. Cir. 1995), the D.C. Circuit held that the EPA exceeded its authority by considering only "federally enforceable" controls in calculating PTE.  The D.C. Circuit redefined "federally enforceable," instead holding that "[t]o qualify as 'federally enforceable,'" controls must simply be "effective as a practical matter" and

---

[8] WildEarth did not discuss this issue in its briefs, but did discuss it during oral argument.  At oral argument, WildEarth agreed that "it all comes down to that state and federally enforceable" issue.  ECF No. 53 at 45:14–16.

"approved by the EPA and integrated into the [SIP]." *Id.* at 1363. "Once included within the SIP, a state control becomes enforceable not only by the state which is its primary regulating authority, but also by the Administrator under [the CAA] and, in certain settings, by private citizens" pursuant to citizen suit provisions. *Id.* The court specifically noted that a state can impose "federally enforceable" limits by imposing "general prohibitory or exclusionary rules, so long as they are included within its SIP." *Id.*

Shortly after *National Mining* the D.C. Circuit issued a corollary opinion vacating the definition of "federally enforceable" under certain CAA regulations. *See Chem. Mfrs. Ass'n v. EPA*, 70 F.3d 637 (D.C. Cir. 1995) (table) (reiterating that it is improper to define PTE as excluding controls unless they are federally enforceable).

In response to the D.C. Circuit, the EPA issued guidance explaining that "the term 'federally enforceable' should now be read to mean 'federally enforceable *or* legally and practicably enforceable by a state or local air pollution control agency.'" Envtl. Prot. Agency, Interim Policy on Federal Enforceability Requirement for Limitations on Potential to Emit (1996) (emphasis added) (hereinafter "Policy on Federal Enforceability"), https://www.epa.gov/sites/production/files/2015-08/documents/pottoemi.pdf. This remains the EPA's policy to date. *See United States v. Questar Gas Mgmt. Co.*, No. 2:08-CV-167 TS, 2011 WL 1793172, at *2 (D. Utah May 11, 2011); Envtl. Prot. Agency, Nat'l Emission Standards for Hazardous Air Pollutants: General Provisions, 72 C.F.R. 69, 70 n.1 (Jan. 3, 2007); Envtl. Prot. Agency, Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule Step 3, GHG Plantwide Applicability Limitations and GHG Synthetic Minor Limitations, 77 C.F.R. 14226 n.44 (Mar. 8, 2012).

There remains the question of whether state regulations that expressly say "state-only" are still "federally enforceable" in a jurisdictional sense.  But I need not and do not answer that question.  I am not asked to determine whether the controls in Regulation 7 may be federally enforced; rather, I am asked to determine whether the controls in Regulation 7 may lower PTE.  Pursuant to *National Mining* and EPA guidance, PTE may be lowered by any controls which are "federally enforceable *or* legally and practicably enforceable by a state or local air pollution control agency.'"  Envtl. Prot. Agency, Policy on Federal Enforceability (emphasis added).  Thus I do not decide whether state controls that expressly say "state-only" are federally enforceable in a jurisdictional sense.

I find that the Division's interpretation of the SIP is entitled to some deference because it is reasonable and supported by federal law.  *See Grand Canyon Trust*, 269 F. Supp. 3d at 1195.  As such, WildEarth's interpretation of the SIP is contrary both to the underlying purpose of the synthetic minor source program and to the Division's reasonable interpretation, which is due some deference.  I find that the SIP's pre-permit controls may lower PTE to the extent that such controls are legally and practicably enforceable by a state or local agency.

### c.   Sufficiency of WildEarth's Allegations Regarding PTE

Having determined that WildEarth's interpretation of the SIP is incorrect, it remains to be determined whether WildEarth has nevertheless sufficiently alleged that defendants' facilities had PTE above major-source thresholds at any stage.  In its complaint, WildEarth alleges that defendants began construction and operation of their facilities "without any federally enforceable limits on air pollution."  ECF No. 1 ¶¶ 75, 115, 148, 180, 211, 250, 288.  As support for this allegation, WildEarth alleges that: each facility had uncontrolled PTE above major-source thresholds; each facility began construction and operation prior to obtaining a synthetic minor

permit; defendants sought to establish federally enforceable limits in their synthetic minor source permit applications; and the federally enforceable limits in the synthetic minor source permits cannot apply before issuance.  ECF No. 1 ¶¶ 75–79, 115–119, 148–152, 180–184, 211–215, 250–255, 288–292.  WildEarth proffers no additional factual allegations regarding PTE.

WildEarth's allegations regarding PTE are thus entirely premised on its incorrect theory that prior to receiving a synthetic minor permit, there are no "federally enforceable" limits on PTE.  During oral argument, WildEarth confirmed that its argument regarding PTE boils down to whether the SIP's pre-permit controls are "federally enforceable."  ECF No. 53 at 45:14–15 (agreeing that "it all comes down to that state and federally enforceable" issue).  Yet WildEarth does not argue, nor does it provide any factual allegations to support such an argument, that the SIP's pre-permit controls are not "federally enforceable *or* legally and practicably enforceable by a state or local air pollution control agency.'"  Envtl Prot. Agency, Policy on Federal Enforceability (emphasis added).

Because WildEarth's allegations in the complaint regarding PTE rest entirely on its incorrect interpretation of the SIP, I must find that WildEarth has failed to allege that defendants' facilities had PTE above major-source thresholds.

Additionally, WildEarth briefly mentions in its response that there is "a factual dispute concerning whether Defendants' facilities' PTE was reduced by the emissions control equipment they installed."  ECF No. 37 at 24–25.  As a reminder, PTE is defined as "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design," and can be lowered by any enforceable physical or regulatory control.  Regulation 3, Part A § I.B.37; 40 C.F.R. §§ 51.166(b)(4) & 52.21(b)(4).

WildEarth specifically argues that "[t]he flares that Defendants use to reduce their actual emissions are not 'integral' to the production of oil and gas, and do not meet the definition of a limitation that can be used to reduce PTE."  ECF No. 37 at 24.  As legal support for this argument, WildEarth cites not to any regulation or statute but to a declaration by Jeremy Murtaugh, a current or former employee of the Division.  ECF No. 37 at 24; ECF No. 37-2 ¶ 2.  According to Mr. Murtaugh, physical controls which are not "integral" to the process of oil and gas production may not be considered in the Division's PTE calculations.  ECF No. 37-2 ¶ 10.  Mr. Murtaugh further testifies that Great Western operates two flares which are not integral to the process of oil and gas production and thus may not be considered in PTE calculations.  *Id.* ¶¶ 5–10.

WildEarth also cites to a 2014 letter from the EPA to Marathon regarding an oil production facility in Wyoming.  ECF No. 37 at 24; Envtl Prot. Agency, Letter to Marathon Oil Company at 1 (Oct. 31, 2014), https://www.epa.gov/sites/production/files/2015-07/documents/2014flares.pdf.  That letter noted that the flares at the Wyoming facility were neither "an integral part of the operation" nor were they "required under any legally and practically enforceable permit condition or CAA regulation," and consequently "the flares cannot be relied upon in calculating the PTE."  *Id.* at 2.

However, WildEarth's complaint does not allege any facts relevant to this argument.  As noted, the allegations in WildEarth's complaint focus entirely on the lack of "federally enforceable limits," not on physical design factors.  WildEarth's complaint includes no allegations regarding physical design factors.  WildEarth's complaint does not allege that the flares are not integral, nor which defendants installed flares (and indeed, Mr. Murtaugh's

declaration references only Great Western).  WildEarth has failed to allege any facts related to flares or any other physical design factors.

Accordingly, WildEarth has failed to allege that defendants' facilities had PTE above major-source thresholds.

2. <u>Actual Emissions</u>

Defendants argue that WildEarth has failed to allege any facts supporting their assertion that each of defendants' facilities had actual emissions above major-source thresholds prior to obtaining synthetic minor permits.  ECF No. 42 at 4.  WildEarth responds that it need not provide any additional facts.  ECF No. 37 at 22.  In cases "where the matters are peculiarly within the knowledge of the defendants," pleading on information and belief satisfies the requirement for a "short and plain statement of the claim" and should be liberally construed in favor of those from whom such knowledge has been hidden.  *Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1372–73 (10th Cir. 1979) (quoting *Carroll v. Morrison Hotel Corp.*, 149 F.2d 404 (7th Cir. 1945).

WildEarth argues that because defendants did not obtain permits prior to beginning construction, there was no compliance monitoring or recordkeeping for actual emissions until issuance of the permits.  ECF No. 37 at 22.  Because there was no monitoring, WildEarth argues that there is no way to know whether defendants complied with any of the pre-permit controls. In theory, WildEarth argues, actual emissions could be as high as the facilities' uncontrolled PTE—and the parties do not dispute that the uncontrolled PTE for each facility is above major-source thresholds.  During oral argument, WildEarth requested that this Court not "rely on the defendants' word . . . that they weren't polluting when they didn't have a permit for two years." ECF No. 53 at 22:5–13.

Defendants respond that they have been subject to compliance monitoring, and that this Court need not rely on their word alone. They note that pursuant to Regulation 3, operators are required to measure actual emissions prior to receiving synthetic minor permits. ECF No. 53 at 5; Regulation 3, Part B, § II.D.7. The Division confirmed that "operators maintain records as of the first day of production to document compliance with control requirements and to track emissions," which "form the basis of the source's permit application, through which the [D]ivision verifies that emissions are and will continue to be below major source thresholds." ECF No. 29-5 at 6.

Unlike WildEarth's legal argument regarding PTE, its argument regarding actual emissions is a factual question. Although the Division has confirmed that defendants complied with applicable pre-permit controls, it is true that WildEarth does not have access to defendants' documentation. I cannot find that the Division's confirmation alone is sufficient to dismiss WildEarth's allegations regarding actual emissions. The fact that the state has determined that no major source permit is necessary does not foreclose suit. *See Voigt*, 2016 WL 3920045, at *8 ("[Section 7604(a)(3)] clearly permits citizens to bring an action against a major source for beginning construction without having a major source construction permit and does not contain an exception for when a state has determined one is not required and issued a minor source permit . . . .").

Accordingly, I find that WildEarth has alleged that defendants' facilities' had actual emissions above major-source thresholds sufficient to survive defendants' motions to dismiss.

**E.  WildEarth's Individual Causes of Action**

Having determined that WildEarth has sufficiently alleged that defendants' facilities had actual emissions (but not PTE) above major-source thresholds, I consider WildEarth's individual causes of action.

### 1.  Claim One: Improper Construction and the 90-Day Exemption

WildEarth's first claim is that defendants began construction of major sources of VOCs prior to obtaining major-source preconstruction permits.  Defendants argue that at the relevant time, the SIP expressly allowed sources applying for synthetic minor permits to submit such permit applications up to 90 days after first production, rather than before construction.[9]  ECF No. 29 at 12.

The 90-day exemption comprises two separate provisions in two different Parts of Regulation 3.  Part B provides that operators of oil and gas facilities are "not required to file an application for a construction permit until they are required to file an [APEN]."  Regulation 3, Part B § II.D.7.  Part A provides that operators of oil and gas facilities must file an APEN "within thirty days after the report of first production is filed . . . but no later than ninety days following the first day of production."  Regulation 3, Part A, § II.D.1.lll.  Defendants interpret this statute as allowing operators of oil and gas facilities to delay submitting an application for a construction permit until up to 90 days after the first day of production.

WildEarth argues that the 90-day exemption does not apply to major sources seeking synthetic minor permits and is thus inapplicable to defendants' facilities.  ECF No. 37 at 17.

---

[9] Although this 90-day exemption was repealed as of January 30, 2020, it may still apply here because each defendant applied for a construction permit prior to January 30, 2020.  *See* Regulation 3, Part B § II.D.7 (noting repeal); Regulation 3, Part A § II.D.1.lll (same); ECF No. 1 ¶¶ 60, 63, 66, 96, 99, 102, 105, 138, 171, 201, 234, 237, 240, 275, 278 (acknowledging that all defendants had applied for synthetic minor permits at the time the complaint was filed).

WildEarth relies on two additional provisions in Part A.  First, WildEarth argues that a provision within Part A expressly precludes Part A exemptions from applying to major sources.  *Id.* Section II.D.1, titled "Exemptions from [APEN] Requirements," provides: "Stationary sources having emission units that are exempt from the requirement to file an [APEN] must nevertheless comply with all requirements that are otherwise applicable . . . including . . . nonattainment [NSR] . . . ."  Regulation 3, Part A, § II.D.1.  WildEarth argues that this provision prevents an operator of any major source from using the 90-day exemption to delay filing their permit and APEN, even if the operator intends to apply for a synthetic minor permit.  ECF No. 37 at 18. Rather, it argues the 90-day exemption applies only to "true" minor sources, i.e. non-synthetic minor sources.

WildEarth's interpretation of Part A, § II.D.1 is incorrect.  As defendants point out, § II.D.1 refers to *emission units* which are exempt from filing an APEN *at all*, not stationary sources which are allowed an extension on their APEN filing requirements.  Any given stationary source is generally comprised of several emission units.  Generally, an operator must file an APEN with respect to each individual emission unit within a stationary source.  *See* Regulation 3, Part A, § II.A.  However, § II.D.1 provides that some emissions units "are deemed to have a negligible impact on air quality" such that they are exempt from APEN requirements. *Id.*, Part A, § II.D.1.  The provision goes on to list specific exempt emission units, including emission points with uncontrolled actual emissions of any criteria pollutants of less than one ton per year, as well as things like air conditioning, recreational fireplaces, safety flares, and aerosol cans.  *See id.*, Part A, § II.D.1.a, c, d, f, u.

This provision then clarifies that the exemption of these negligible emission units does not negate the overall stationary source's obligation to comply with any applicable major-source

requirements.  Specifically, "[a]n applicant may not omit any information regarding APEN exempt emission units in any permit application if such information if needed to determine the applicability of . . . nonattainment [NSR]."  Regulation 3, Part A, § II.D.1.  Thus, the provision does not wholesale preclude Part A exemptions from applying to major sources and their Part D requirements.  It does not preclude synthetic minor sources from using the 90-day exemption.

WildEarth's second argument also relies on this misinterpretation of Part A § II.D.1. WildEarth correctly notes that the 90-day exemption constitutes two interlinking provisions, one in Part B and one in Part A.  WildEarth asserts that because Part B does not provide its own 90-day exemption provision independent from Part A, and because Part A § II.D.1 precludes Part A exemptions from applying to Part D requirements, "neither Part A's [n]or Part B's [90-day exemption provisions] provide defendants with any delay in complying with Part D."  ECF No. 37 at 19.  This argument fails because, as discussed, Part A § II.D.1 does not preclude Part A exemptions from applying to Part D requirements except with regard to these individual APEN-exempt emission units.

Third, WildEarth notes that the section within Part B that houses the 90-day exemption also states: "Permit exemptions taken under this section do not affect the applicability of any State or Federal regulations that are otherwise applicable to the source."  Regulation 3, Part B, § II.D.  WildEarth argues that Part D constitutes an "otherwise applicable" regulation that the 90-day exemption thus does not affect.  ECF No. 37 at 19–20.  As such, it asserts that the 90-day exemption does not allow major sources to avoid Part D major-source requirements by delaying their permit applications.

Defendants do not address this statutory argument.  However, the Division appears to agree with WildEarth's interpretation to some extent.  In its response to WildEarth's public

comments, the Division noted that Part B, § II.D meant that "operators of sources whose *actual emissions* will be above major source thresholds may not avoid the requirements of the [NSR] program by availing themselves of the ability to delay application submittal until after construction and operation." ECF No. 29-5 at 6 (emphasis added). Thus, the Division's interpretation is that NSR requirements are "otherwise applicable" to sources whose actual emissions are above major-source thresholds prior to receipt of their synthetic minor permits.

Consistent with the Division's interpretation, I find that the 90-day exemption does not apply to sources whose actual emissions will be above major-source thresholds. Because WildEarth has sufficiently alleged that defendants' facilities' actual emissions were above major-source thresholds, I cannot dismiss this claim based on the 90-day exemption.

The Division's interpretation leaves open the question of whether the 90-day exemption applies to sources whose PTE will be above major-source thresholds. Yet I need not and do not answer that question, given that WildEarth has failed to allege that defendants' facilities had PTE above major-source thresholds.

Accordingly, defendants' motion to dismiss WildEarth's first claim is denied to the extent it relies on actual emissions of VOCs.

### 2. Claim Two: Improper Operation

WildEarth's second claim is that defendants improperly operated major sources of VOCs without following major-source operational requirements. Defendants have no defense to this claim beyond the general argument that they never constituted major sources. Because WildEarth has sufficiently alleged that defendants' facilities' actual emissions were above major-source thresholds, I cannot dismiss this claim.

Accordingly, defendants' motion to dismiss WildEarth's second claim is denied to the extent it relies on actual emissions of VOCs.

### 3.   Claim Three: MACT Violations

WildEarth's third claim is that the five HAP defendants improperly constructed and operated major sources of HAPs without following MACT requirements.  Defendants have no defense to this claim beyond the general argument that they never constituted major sources.

The same logic applies to both VOCs and HAPs.  The only difference between this claim and the claims related to VOCs is that they are based on different types of pollutants with different thresholds.  But the type of pollutant and the threshold level is not relevant here.  The relevant facts are the same: because defendants did not receive major-source permits, WildEarth has no way of tracking whether defendants kept their actual emissions below major-source thresholds.  Because WildEarth has sufficiently alleged that defendants' facilities' actual emissions were above major-source thresholds, I cannot dismiss this claim.

Accordingly, defendants' motion to dismiss WildEarth's third claim is denied to the extent it relies on actual emissions of HAPs.

**ORDER**

Defendants' joint motion to dismiss, ECF No. 29, is DENIED.  Great Western's motion

to dismiss, ECF No. 30, is DENIED.

DATED this 1st day of May, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge